407 So.2d 102 (1981)
Charles Edward "Chuck" DEPREO
v.
STATE of Mississippi.
No. 52785.
Supreme Court of Mississippi.
December 16, 1981.
*103 James E. Atchison and Richard D. Horne, Mobile, Ala., for appellant.
Bill Allain, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, P.J., and WALKER and BOWLING, JJ.
BOWLING, Justice, for the Court:
Appellant Charles Edward "Chuck" Depreo was indicted, tried and convicted of the crime of murder in the Circuit Court of Hancock County, Mississippi. From a sentence of life imprisonment with the Department of Corrections, he appeals to this Court and assigns the following errors, to-wit:
I. THE TRIAL COURT ERRED IN NOT EXCLUDING THE ALLEGED CONFESSION OF THE APPELLANT.
II. THE TRIAL COURT ERRED IN NOT SUPPRESSING THE EVIDENCE REGARDING THE SEARCH AND THE RESULTS THEREOF, OF THE HOME OF EIDO DEPREO, APPELLANT'S FATHER.

*104 III. THE TRIAL COURT ERRED IN FAILING TO GRANT A HEARING ON APPELLANT'S SPECIAL BILL OF EXCEPTIONS.
During the early morning, night-time hours of April 8, 1978, Janice Ladner met her death at her home in Hancock County, Mississippi. She was shot three times with what proved to be a.22 caliber gun, after which the home was set on fire and burned. An autopsy revealed that she was dead prior to the fire. Living with Mrs. Ladner was her six-year-old daughter. At the time of the shooting, a bullet struck the child a glancing blow. She received an injury to her head in some manner not definitely determined. The child was able to leave the house and go to the house of a nearby neighbor and inform the residents there of what had occurred.
There is no need to relate in detail in this opinion all of the evidence presented by the state and appellant at the trial, due to the above stated limited assignments of error. We shall discuss the evidence in the record that relates to each of these assignments.

I. THE TRIAL COURT ERRED IN NOT EXCLUDING THE ALLEGED CONFESSION OF THE APPELLANT.
There was a pre-trial hearing on appellant's motion to suppress an alleged confession given by him at the Navy facilities at Portsmouth, Virginia. Appellant had been in the Navy service since 1977. During the course of the investigation by law enforcement officials after the shooting of Mrs. Ladner, matters were developed which led to a belief by the officials that the appellant had committed the crime. The events occurring thereafter were related on the motion to suppress by Ronnie Peterson, Chief Deputy Sheriff of Hancock County. He testified that he, along with Sheriff Ladner and Mississippi Highway Patrol Investigator Joe Price, went to Portsmouth, Virginia, on April 22, 1978. Arrangements for the trip and the contacting of appellant were made through the Navy authorities in Gulfport, Mississippi, and the Navy authorities in Virginia. The principal authority for the Navy in Virginia who handled the details of appellant meeting the officials from Mississippi was an Officer Mote, who was assigned to the Naval Investigative Service at Portsmouth. Under the arrangements between the Naval officer in Gulfport, Mississippi, and Officer Mote, appellant was detained on his ship by the Naval authorities until the three Mississippi officers arrived at about 12:30 p.m. on April 22, 1978. As hereinafter shall be discussed the Mississippi authorities carried with them a warrant for the arrest of appellant on a charge of arson involving a school building and three "John Doe" warrants. According to the testimony of Mr. Peterson, upon arrival at Portsmouth, they were met by two Navy men, Donovan and Redding, who carried them to the Navy facilities where they met Officer Mote, who handled all further proceedings for the Navy.
Peterson testified that the three officers and appellant were placed in a room at about 1:30 p.m. Peterson testified that Sheriff Ladner initially advised appellant of all of his rights, including all requirements of the so-called Miranda warning; that this was first done verbally and then appellant freely and voluntarily executed a written waiver in which he again was advised of all of his rights, including the right to remain silent and the right to have an attorney present. This statement shows the time of execution as 1:45 p.m., was signed by appellant and witnessed by the three officers.
Appellant had not been advised that he was under suspicion for murder. Officer Mote had advised appellant that he was to be questioned about an arson. Later in the hearing Officer Mote testified that when he was first contacted by the Gulfport Navy authorities he was requested not to advise appellant that he was also subject of a homicide investigation.
Peterson testified that for about two hours appellant was questioned concerning both the arson and the death of Mrs. Ladner. Peterson's testimony was that various breaks were taken during the questioning and refreshments secured, for both the officers and appellant. Peterson's positive testimony was that there were no threats or *105 coercion of any type made by the officers during the questioning of appellant. Upon requesting appellant to return to Mississippi with them for further investigation, appellant requested that he be allowed to talk with Officer Mote. This was done with Officers Mote and Donovan spending about thirty minutes alone with appellant. The three Mississippi officers were never in the room during appellant's conversation with the Navy personnel.
Peterson testified that after appellant's conversation with the Navy officers, he, Peterson, returned to the room alone. He first secured another waiver of rights signed by appellant, the same type as was secured originally. According to Peterson, the execution of this instrument was without any type of force or duress upon appellant and he fully understood what he was doing. This waiver was executed according to its terms at 5:15 p.m. Peterson talked with appellant further and according to Peterson, appellant admitted that he killed Mrs. Ladner and would write a confession statement. Sheriff Ladner and Officer Price were then called into the room. Peterson and the others witnessed the writing of the statement by appellant with a pen and in his own handwriting. The statement set out details of what occurred when Mrs. Ladner was killed, including the shooting with a .22 caliber pistol using .22 long hollow points, and the fact that the young child was struck by mistake. According to his statement, he then set the house on fire and walked back home. He gave the time as about 1:30 a.m. and he reached home at about 2:15 or 2:30 and put the gun in a closet and went to bed.
After Peterson's testimony the state rested its presentation of evidence on the motion to suppress. Defendant placed on the stand Officer Robert M. Mote, whose connection with the matter has already been developed. Officer Mote reiterated that he was first contacted by the Navy Investigative Service representative in Gulfport. Later he talked by telephone with Chief Deputy Peterson regarding the trip of the officers to Portsmouth and that appellant would be available. His testimony was that prior to the officers coming to Virginia, he had only told appellant he was being investigated for arson. He was requested to do this by Officer Peterson. After the Mississippi officers had talked with appellant for about two hours, Mote was advised that appellant wished to talk with a Navy representative. Officer Mote went into the room with appellant and the Mississippi officers stayed outside. Mote talked with appellant, according to him, for fifteen or twenty minutes. Mote secured from appellant a Navy form waiver of rights, which is similar to the form ordinarily used by law enforcement officials and advised appellant, among other things, that he had the right to remain silent and had the right to consult with a lawyer and have the lawyer present during the interview. This was signed by appellant at 3:50 p.m. and witnessed by Officer Mote and Officer Donovan. Mote testified that appellant asked if he could talk with a Navy attorney. Mote advised appellant that the matter was solely a civil matter and not service connected; therefore, he could not be furnished a Navy lawyer, but he could have a civilian lawyer. According to Mote, appellant advised him that he did not want a civilian lawyer. Mote suggested to appellant that he accompany the officers back to Mississippi to try to straighten out the entire matter. Mote admitted that he and appellant principally were talking about the arson charge at that time. Appellant agreed with Mote that he should accompany the officers back to Mississippi. He then signed a typewritten statement in which he stated that he would voluntarily agree to accompany the Mississippi officers to Hancock County for questioning in a criminal matter. The instrument further stated he had been advised of his right against self-incrimination and the action was freely and voluntarily done on his part. It stated that he had been advised that they wished to question him concerning an arson that occurred in Hancock County. After initialling two typographical errors in the statement, appellant signed it; the same as he had done on the other three instruments. This was sworn to by Officer *106 Mote, an official authorized to administer oaths.
Mote testified that, after he had left the room and the officers again talked with appellant, he was advised that appellant had executed a confession.
Officer Joe Price was called as a witness for the defendant. His brief testimony corroborated that of Officer Peterson.
Appellant did not testify on the motion to suppress. He did testify at the trial. The gist of his testimony, giving the reason for executing the confession in Virginia, was that he did not want the officers to search the apartment where he and others lived because his roommates had marijuana in the apartment. He also testified that his reason for executing the confession was that he did not want his father's house to be searched. Appellant contends that the confession was the product of intense, albeit, subtle pressure in violation of the appellant's right to be free from self-incrimination under the Constitutions of the United States and the State of Mississippi. He further contends that the confession was attended by open and orchestrated deceit and corrupt acts.
In the first place in determining whether or not the lower court erroneously overruled the motion to suppress the confession, we should look only to the evidence presented at the pre-trial hearing. As hereinbefore stated, appellant offered no evidence whatever to the uncontradicted proof that his confession was freely and voluntarily given, and he was not subject to any abuse or coercion whatever. In fact, even in his testimony at the trial, appellant gave no evidence that he was in any way abused. His contention was that he was coerced in a subtle manner. Without discussing the testimony at the trial in detail, if all of it had been given at the hearing on the suppression motion, there would have been a clear question for the lower court as to whether the confession was voluntarily made. There might have been some small items of conflict, but the overwhelming evidence was that the confession was freely and voluntarily made. Certainly, the lower court was not in error in finding under its discretion that the motion to suppress should have been overruled. Clemons v. State, 316 So.2d 252 (Miss. 1975).
Appellant contends that he gave the confession without the benefit of legal advice. The only evidence that he can produce in this contention is the hereinabove discussed request to Officer Mote to allow him to talk with a Navy lawyer. We have heretofore seen that the proof is undisputed that he was offered a civil lawyer and refused such offer. In considering whether or not the request for a Navy lawyer and the advice to him that a Navy lawyer could not be furnished in a civil matter, we have to look at the totality of the evidence. There could have been no other holding but that the evidence is overwhelming that after this request, appellant "knowingly and intelligently" waived his rights to an attorney by stating to both naval officers and the three Mississippi officers, both orally and in writing, that he did not wish a civilian attorney. This waiver was clearly set out by this Court in Jordan v. State, 365 So.2d 1198 (Miss. 1978). Also see: Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) and Nash v. Estelle, 597 F.2d 513 (5th Cir.1979).

II. THE TRIAL COURT ERRED IN NOT SUPPRESSING THE EVIDENCE REGARDING THE SEARCH AND THE RESULTS THEREOF OF THE HOME OF EIDO DEPREO, APPELLANT'S FATHER.
Appellant contends that the affidavit in support of the search warrant failed to state with sufficient particularity the factual basis of the credibility of the informants or sources who filed the information therein and failed to state sufficient facts.
It is further contended that the affidavit contained both innocent and intentional misrepresentations.
In the first place, the record does not contain the affidavit for the search warrant. The burden was on appellant to examine the record and ascertain that this exhibit was forwarded to the Court. Under *107 the prior opinions of this Court, we could dispose of this contention on this ground, but we do not do so.
In making a thorough study of the lengthy record in the case, we find at the hearing on the motion to suppress the fruits of the search warrant of the house owned and occupied by appellant's father, the affidavit actually was introduced in evidence by the state. The district attorney stated into the record "May we have marked as state's exhibit number next, affidavit for a search warrant which has attached to it the underlying facts and circumstances for the purpose of this motion." As a result of this request the court allowed that document to be marked as state's Exhibit No. 8. This exhibit does not appear in the record. Appellant attached to his abstract of the record a photostatic copy of the exhibit and although technically not required to do so, we accept that instrument marked "Exhibit 8" as a part of the appellant's appeal.
On appellant's motion to suppress the fruits of the search of his father's home, which fruit consisted of a .22 caliber revolver with three spent shells, in addition to other guns, revolvers and pistols, appellant called Philip M. Ladner, an investigator for the Mississippi Highway Patrol. Ladner testified that he and Investigator Naylor made the affidavit for the search warrant and that the affidavit and accompanying underlying facts and circumstances were sworn to by both. This is verified by the exhibit attached to appellant's abstract as above stated. Ladner testified that in addition to the affidavit and its attachment, he went into more facts with Judge Logan, then a circuit judge. He talked with Judge Logan at length. He testified regarding his contact with Brother Joseph of the school where the alleged arson occurred. He testified that prior to completing the affidavit he listened to the tape that the doctor had made with the six-year-old daughter shortly after the incident occurred in which the daughter stated that the man doing the shooting was "Chuck" and had dark brown hair. A contention is made that the young girl immediately after the incident stated the man had blonde hair. The affidavit was made based on the child's statement after minor hypnosis and questioning by a child psychologist and other such experts.
Appellant next called T.P. Naylor, also an investigator with the Mississippi Highway Patrol. He testified that he and Ladner were assisted in securing the information by two deputies Bernard and Seay, but that just he and Ladner appeared before Judge Logan. Both were put under oath by Judge Logan and questioned extensively by him, in addition to having the affidavit and its attachments. Naylor had participated personally in all of the matters set out in the affidavit and told Judge Logan of all except those expressly handled by Officer Ladner. The officers were searching for a .22 caliber pistol that was the type of weapon that killed Mrs. Ladner and was the type that the young daughter picked out from the pistols as the type she saw being held by "Chuck."
At the outset, a reading of the affidavit for the search warrant, together with the attachments giving a brief history of the entire matter and the underlying facts and circumstances, and the undisputed interrogation of both officers by Judge Logan, clearly showed probable cause for the issuance of the search warrant.
Another issue raised in the appeal which needs to be discussed is whether or not appellant had standing to contest the issuance of the search warrant. As stated above, even if he did have such standing, there clearly was probable cause for it to be issued. As heretofore seen, appellant had been a Navy service personnel for approximately a year prior to the homicide. He was living in an apartment in Portsmouth, Virginia. Admittedly, during the 1977 Christmas holidays, he had visited his parents who had separated. As stated, the father was still living in the house. Appellant came home on leave again in April 1978, and was staying with his father in the latter's house when the homicide occurred. There can be no doubt but that the house was owned and occupied by the father Eido Depreo. The United States Supreme Court *108 in Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), merged the concept of standing into "a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect," and that in making this determination the challenger must show that he has a "legitimate expectation of privacy in the place searched and things seized." In Rakas, the Court further stated:
As we stated in Alderman v. United States, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969); "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." See Brown v. United States, 411 U.S. 223, 230, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973); Simmons v. United States, 390 U.S. 377, 389, 88 S.Ct. 967, 973, 19 L.Ed.2d 1247 (1968); Wong Sun v. United States, 371 U.S. 471, 492, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963); cf. Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734, 97 A.L.R.2d 1277 (1961); Gouled v. United States, 255 U.S. 298, 304, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921). A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. Alderman, supra, at 174, 89 S.Ct. at 966, 22 L.Ed.2d 176. (439 U.S. 133-134, 99 S.Ct. 425, 58 L.Ed.2d 394-395).
We heretofore have seen that the only evidence offered on the motion to suppress the fruits of the search was the testimony of the two officers who handled the securing of the warrant. Again, as in the motion to suppress the confession, the appellant did not testify. As stated, it developed at the trial that he had come to his father's house on two leaves since leaving for service in the Navy. During the April 1978 leave he stayed part-time at his mother's apartment. Admittedly, the guns found in the search belonged to the father and were kept in the father's closet in a box. It is clear that appellant did not show a "legitimate expectation of privacy" or that the search had "infringed an interest" of appellant. We therefore hold that not only did the appellant fail to show "standing" to object to the search, as that term was in force prior to Rakas, supra, but he further failed to show the requirements set out in Rakas. Assignment of Error No. II is therefore without merit.

III. THE TRIAL COURT ERRED IN FAILING TO GRANT A HEARING ON APPELLANT'S SPECIAL BILL OF EXCEPTIONS.
Appellant's trial was had at the January 1979 term of Circuit Court in Hancock County, which is a three-week term beginning the second Monday in January. The trial ended on January 27, 1979, with the jury verdict of guilty. The judgment and sentence of the court were entered on the same day. On that same day the appellant filed his motion for a new trial, stating only that the verdict is "against the clear weight of the evidence." On that same day, appellant filed a document entitled "Motion in Forma Pauperis for a Free Trial Transcript." This motion was approved by the trial judge and filed on the same day. The court overruled the motion for new trial and entered an order allowing appellant's appeal without prepayment of costs and without the filing of a cost bond.
By letter dated January 29, 1979, appellant's attorney notified the official court reporter to transcribe the testimony. For some reason this notice was not filed until March 12, 1979, but well within the appeal period.
On September 2, 1980, appellant's attorney filed two affidavits dated August 28, 1980, stating that on June 26, 1979, they had delivered an instrument styled "Special Bill of Exceptions" to the office of the Circuit Clerk of Hancock County, Mississippi. This special bill of exceptions alleged certain irregularities in the conduct of the jury and the sequestration of the jury and asked for a hearing on this instrument by the trial court. It is obvious from the record that for some reason the docket did not *109 show the instrument being filed on June 26, 1979, but it obviously was so filed, as in the record there is a letter dated June 29, 1979, from the trial court to appellant's attorney stating the following: "Your motion for a new trial styled `Special Bill of Exceptions', a copy of which was enclosed with your letter of June 27, cannot be considered by the circuit court while the case is on appeal to the Supreme Court. An appeal divests the court of jurisdiction. There is no such thing as divided jurisdiction."
It is obvious that the filing of the instrument on June 26, 1979, was after the appeal had been perfected to this Court and therefore the lower court was entirely correct in holding that it had no jurisdiction to hear the instrument filed. Denton v. Maples, 394 So.2d 895 (Miss. 1981); Edmonds v. Delta Democrat Publishing Co., 221 Miss. 785, 75 So.2d 73 (1954).
It is therefore apparent that the third and final assignment of error is without merit. In the event appellant has merit in the allegations in his instrument filed, after the appeal was perfected, he has adequate recourse to present those contentions at the proper time and place.
Going further from the specific assignments of error, we carefully have studied the entire record in this cause and can only come to the conclusion that the record shows evidence sufficient for the jury to have found appellant guilty of murdering Mrs. Ladner.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and HAWKINS, JJ., concur.