540 So.2d 13 (1989)
Edgar POWELL, Jr.
v.
STATE of Mississippi.
No. 58260.
Supreme Court of Mississippi.
February 22, 1989.
Jeff E. Bradley, Tommy Dale, Hattiesburg, for appellant.
Mike Moore, Atty. Gen. by Leyser Q. Morris, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and ZUCCARO, JJ.
ROBERTSON, Justice, for the Court:

I.
Today's appellant at age twenty-three has been convicted of armed robbery and sentenced as an habitual offender to forty (40) years imprisonment without eligibility for parole. The conviction we examine rests almost entirely upon a confession. The record before us impresses upon us the sobering thought that we can never be sure a trial has produced the truth. We may only hope that fairness and fidelity to law may enable us to reach for truth, though it be ever beyond our grasp. With no little temerity, we affirm.

II.
On the evening of January 31, 1986, Charles Murphy was bagging beer in the back of the Dixie Gas Station on West Pine Street, Hattiesburg, Mississippi. A man met Murphy at the door to the front and said "Just give it to me" ... "Give me your money." The man held a knife in his hand. Murphy reached for the gun he kept in his cash register, but the man grabbed the gun first, along with about $150 cash, and fled. Murphy's only identification of this man was that he was black and wore little beads "in the back of his head." He has since *14 suffered two unrelated strokes and cannot identify the robber.
A parallel story. Edgar Powell, Jr. has lived in Hattiesburg, Mississippi, all of his life. The month he turned eighteen he was involved in a burglary. Shortly after that, an attempted grand larceny. For violating his parole, he went to Parchman. On the streets again, in December of 1985, Powell was picked up on either a shoplifting or receiving stolen property charge. After Powell had spent approximately six weeks in jail, Det. Larry Brinkley of the Hattiesburg Police Department arranged for Powell to be released, thinking that "he may could come up with some good information."
Between mid-January of 1986 to mid-February of that same year, Powell was an official informant for Brinkley. He was issued a code name  "B-1". Brinkley requested that he get/give information about a fencing operation going on in Hattiesburg. On February 10, 1986, Powell went to the Hattiesburg Police Station looking for Brinkley, who was not there. Brinkley went to Powell's house on the 12th to see what Powell had wanted.
They talked about some crimes in the neighborhood. Brinkley asked Powell if he knew anything of an armed robbery (not the one in question). Brinkley says Powell "thought for just a few seconds and he told me to wait just a minute, and Edgar left out of the living room and walked into his bedroom and stayed in there, oh, less than a minute, just a very short time, and came back out of the bedroom with this gun in his hand."
Brinkley says Powell told him that after leaving the police station on the 10th, he went to his apartment, got his BB gun and went bird hunting by the railroad tracks near Steelman's Grocery, where he found the gun. Brinkley was immediately suspicious: it had been quite rainy and muggy recently and this pistol had no signs of rust but was, in fact, dusty. Brinkley took the gun to the Dixie Gas Station for identification. It is not clear from the record who there identified it. Brinkley merely testifies it was identified as the gun taken in the robbery.
Brinkley returned to Powell's apartment on the 13th and asked Powell to show him the spot where he had found the gun. Powell did. Powell remembers it differently: Brinkley came to his apartment and said "Edgar, get up, buddy. I'm going  I need to talk to you. I want you to come with me. Put some clothes on and come down to the station with me." Once at the railroad tracks Brinkley asked Powell if he would come with him to the police station to talk a little more about this gun. Powell went voluntarily.
Brinkley and Powell went alone into the polygraph room at the Old Methodist Hospital Police Station. Brinkley says once there he read Powell his rights from a Miranda card. Powell says he did not read him his Miranda rights at this time. Rather, Powell says Brinkley got upset and took Powell into a second room where a "black fellow named Jerome and some detectives" were. Brinkley cleared that room and Powell maintained his story about finding the gun:
I just told him that because I didn't want to tell Mr. Brinkley that I was gambling. At that time I was on parole and I didn't supposed to be gambling.
Brinkley says after he interviewed Powell a little more Powell told him he had purchased the gun from a guy on Dabbs Street. Brinkley did not believe it: "I felt like we needed to talk a little bit more about the gun." Upon further questioning and, according to Brinkley, a subsequent Miranda reading and signing of the Waiver of Rights form, "he advised me that he committed the robbery." Brinkley says no abuse nor inducements occurred and Powell freely and voluntarily signed the waiver.
Powell remembers this differently, He says he never told Brinkley any of the information that Brinkley was apparently entering on his typewriter. Powell says he cannot read, has completed only the sixth grade, can write his name but little else. He claims no one read the statement to him *15 and he presumed it was a typed copy of the buying-it-on-Dabbs-Street confession.
Powell's defense at trial was an alibi.

III.
Powell first complains that at the suppression hearing  held outside the presence of the jury  the Court permitted the prosecution to question him regarding the truthfulness vel non of the confession Det. Brinkley presented. The record before us reflects that on cross-examination the prosecution most definitely entered the arena of truthfulness and, as well, several other issues besides voluntariness.
For purposes of the federal constitution, the Circuit Court's attention at such a suppression hearing should be focused "on the question whether the behavior of the state's law enforcement officials was such as to over-bear petitioner's will to resist and bring about confessions not freely self-determined  a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth." Rogers v. Richmond, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760, 768 (1961).
We elaborated the point in Rhone v. State, 254 So.2d 750 (Miss. 1971).
[The] defendant had a right to testify as to the voluntariness of the confession without being subjected to cross-examination as to the truthfulness of the confession. To allow this procedure might effectively chill a defendant's right to testify on a preliminary inquiry as to the competency of a confession.
Rhone, 254 So.2d at 753, 754.
On the same point, the Court of Appeals for the Fourth Circuit in Doby v. South Carolina Dept. of Corrections, 741 F.2d 76 (4th Cir.1984) has written:
The purpose of a Jackson v. Denno hearing is to determine the voluntariness of a confession and during such hearing the trial judge is "duty bound to ignore implications of reliability ... and to shut from his mind any internal evidence of authenticity that a confession itself might bear." Lego v. Twomey, 404 U.S. 477, 484 n. 12, 92 S.Ct. 619, 624 n. 12, 30 L.Ed.2d 618 (1972).
It is clear from the language used by the trial judge in questioning the psychiatrist and defense counsel, as well as addressing the jurors, that he considered the truth of appellant's confession in deciding its admissibility. Rogers v. Richmond [365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)] supra, prohibits a trial judge from relying upon the truthfulness of a confession when deciding whether it should be admitted as a voluntary statement of the accused.
Doby, 741 F.2d at 78.
In this case there was extensive and impermissible cross-examination concerning the truthfulness of Powell's statement. The Circuit Court in the end made detailed findings of fact that Powell had been Miranda warned and had knowingly and voluntarily waived his right to remain silent and confessed.[1] The statement accordingly *16 was held admissible. Among those findings we find no reference to the statement's truthfulness. Once the confession is before the jury, it is no longer impermissible  cross-examination about the credibility of the confession becomes a key jury question. The error in receiving the testimony on truthfulness at the suppression hearing does not require reversal.

IV.
This leads to Powell's next argument: that his confession had been obtained by a hope of leniency in the future  arguably a reasonable hope, because Brinkley had previously gotten Powell out of jail.
Where a criminal defendant challenges the voluntariness of a confession, he has a due process right to a reliable determination that the confession was in fact voluntarily given. Jackson v. Denno, 378 U.S. 368, 377, 84 S.Ct. 1774, 1781, 12 L.Ed.2d 908, 915 (1964); Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618, 627 (1972); Gavin v. State, 473 So.2d 952, 954 (Miss. 1985). The circuit court, as the trier of the facts, is charged with the determination of whether there has been, under the totality of the circumstances, a knowing and voluntary waiver of the accused's privilege against self-incrimination. Jones v. State, 461 So.2d 686, 696-97 (Miss. 1984); Depreo v. State, 407 So.2d 102, 106 (Miss. 1981); Lee v. State, 338 So.2d 399, 401 (Miss. 1976).
In challenging the Circuit Court's admissibility ruling, Powell necessarily confronts established limitations upon this Court's scope of review. Neal v. State, 451 So.2d 743, 753 (Miss. 1984). Ordinarily we will not overturn a finding of fact made by a circuit court regarding voluntariness of a confession unless it be clearly erroneous. See, e.g., Gavin v. State, 473 So.2d 952, 954 (Miss. 1985); Hall v. State, 427 So.2d 957, 960 (Miss. 1983); Ratliff v. State, 317 So.2d 403, 404 (Miss. 1975); cf. Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983); Jones v. State, 461 So.2d 686, 697 (Miss. 1984).
These limitations upon our scope of review may be enforced, however, only where the factfinder applied the correct legal standard. See Woodward v. State, 533 So.2d 418, 427 (Miss. 1988); Chisolm v. State, 529 So.2d 630, 633 (Miss. 1988); Watts v. State, 492 So.2d 1281, 1289 (Miss. 1986). This premise in mind, we find instructive the Court of Appeals' decision in United States v. Kreczmer, 636 F.2d 108 (5th Cir.1981), where the Court turned its focus more narrowly on the trial court's actual findings as opposed to the evidence heard at the trial. The magistrate's report noted: "His [Kreczmer's] detailed statement is identical to what allegedly happened" in determining its admissibility. Kreczmer at 110. The Fifth Circuit affirmed despite the Rogers v. Richmond problem:

*17 Our review of the record convinces us that this Court did not employ an impermissible standard in finding the confession voluntary. The magistrate's finding that appellant's "detailed statement" is identical to what allegedly happened" is immediately followed by the sentence: "While not passing on its truthfulness, it's exactness shows clear rational and coherent mental processes at the time." In the entire report the magistrate mentioned the truthfulness of the confession only in the single statement quoted above. Indeed, the magistrate specifically explained that he was not "passing" on the issue of truthfulness.
Kreczmer, 636 F.2d at 110.
All of this said, we are left with a feeling of disquiet. Det. Brinkley had once before gotten Powell out of jail. He had engaged Powell's services as an informant and had issued him a code name: "B-1". In other contexts we might describe the relationship between Powell and Brinkley as one involving special confidence and trust. Still, we are left with the extensive findings of fact made by the Circuit Court, nor can we deny that those findings are supported by substantial evidence. Indeed, in the end Det. Brinkley testified
Q. And at the time you took the statement from him, was it clear to Edgar Powell that all bets were off as far as anything previous about trying to help him or anything else?
A. Yes, sir, that's correct.
We have no authority but to affirm.
CONVICTION OF ARMED ROBBERY AND SENTENCE OF FORTY (40) YEARS IMPRISONMENT WITHOUT PROBATION OR PAROLE AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and Prather, Sullivan, Anderson and ZUCCARO, JJ., concur.
HAWKINS, P.J., and PITTMAN, J., not participating.
NOTES
[1] The Circuit Court's full findings of fact read as follows:

This Court now finds beyond a reasonable doubt, but not necessarily in this chronological order, that (1) prior to questioning, the defendant had his Miranda rights explained to him and that he understood his rights, and that the rights were read to the defendant by Det. Brinkley; (2) that the only people present at the time of the statement were Det. Brinkley and the defendant; (3) that the defendant executed a Waiver of Rights and that, according to the waiver which is in evidence herein for identification only, that the time of the execution of that waiver was 10:59 and that said waiver was signed by the defendant, and that the defendant testified that the waiver contained his signature; (4) that the defendant effectively and lawfully waived his rights and made a free and voluntary statement to Det. Brinkley and that Det. Brinkley typed the statement and then read the same to the defendant, and that the time of that statement was 11:04; (5) that when the defendant was carried to the office of Ms. Kathy Blackledge, a notary public, and that Ms. Blackledge asked the defendant if the statement had been read to him and if he understood the same, and that the defendant answered "yes" to these questions, and then that defendant signed the statement in the presence of Det. Brinkley and Ms. Blackledge, and that Ms. Blackledge notarized the same; (6) that both the Waiver of Rights and the statement are in the same condition as the date on which they were executed, with the exception of the court's markings; (7) that the defendant voluntarily and freely signed the Waiver of Rights; (8) that the defendant was not physically abused or forced to sign the waiver; (9) that there were no promises of reward or otherwise made to the defendant on the occasion in order to get him to sign the waiver; (10) that there were no threats made or used in order to get the defendant to sign the waiver; (11) that the defendant knew and understood what he was doing and voluntarily waived his rights; (12) that the defendant, after receiving the required warnings, waived his right to remain silent and made a statement; (13) again, that the only people present at this statement were Det. Brinkley and the defendant; (14) that the defendant was not physically abused or forced to make a statement; (15) no promises of reward or otherwise were made to the defendant in order to induce a statement; (16) there were no threats made or used in order to obtain the statement; (17) there was not any coercion of any type made or used against the defendant in order to obtain the statement; (18) that the statement was reduced to writing by Det. Brinkley; (19) that after Det. Brinkley read the statement to the defendant, that Det. Brinkley and Ms. Kathy Blackledge witnessed the defendant signing the statement and that the same was notarized by Ms. Blackledge.
It is based upon these findings that this Court is of the opinion, beyond a reasonable doubt, that the statement of the defendant was free and voluntary and that the same was not induced by any violence, threats of violence or offers of reward, and that, therefore, the motion for suppression is hereby overruled and denied in all particulars, and that if the State of Mississippi desires to do so, that this statement may be heard by this jury after the State has met the necessary criteria for the introduction of the same.