956 So.2d 951 (2006)
Contrell CARTER, Jr. a/k/a Cottrell Carter, Jr., Appellant,
v.
STATE of Mississippi, Appellee.
No. 2004-KA-02109-COA.
Court of Appeals of Mississippi.
August 22, 2006.
Rehearing Denied February 6, 2007.
*954 James A. Williams, Attorneys for Appellant.
Office of the Attorney General by Deirdre McCrory, Attorneys for Appellee.
Before LEE, P.J., SOUTHWICK, and ISHEE, JJ.
ISHEE, J., for the Court.
¶ 1. Contrell Carter, Jr., a/k/a Cottrell Carter, Jr., was convicted in Circuit Court of Lauderdale County of sexual battery and statutory rape, and received concurrent sentences of thirty years for each in the custody of the Mississippi Department of Corrections ("MDOC"). Aggrieved, Carter appeals. Finding no error, we affirm.

FACTS
¶ 2. In 2003, K.B.'s then six-year old daughter, D.B. (born on October 4, 1996), was spending time with her father, grandfather, and uncles. At some point during January or February of 2003, Carter, D.B.'s uncle, took D.B. and her eight-year-old brother, A.B., squirrel hunting in the woods. D.B. testified that, while in the woods, Carter gave A.B. the gun and told him to turn around. Carter then told D.B. to take off her clothes. D.B. refused, and Carter removed her clothes and had forcible sexual intercourse with her. D.B. then told her brother to shoot Carter, but he did not, and Carter took the rifle from him. Carter, A.B. and D.B. then returned to D.B.'s grandmother's house.[1]
¶ 3. Some time later, in August 2003, D.B. complained of a burning sensation when she urinated. She then told her mother and grandmother what had occurred with Carter, after which K.B. took her to the hospital and then to Wesley House, where she spoke with counselors.
¶ 4. When an investigator for the Lauderdale County Sheriff's Department was informed of the alleged sexual assault, he met with D.B. and her mother at Wesley House, where D.B.'s account of events was tape-recorded. After listening to D.B.'s account of the events, the investigator decided that there was enough information to go forward and speak to Carter about the incident. Consequently, on August 11, 2003, the investigator visited Carter's residence and told him that the sheriff's department needed to speak with him. The *955 investigator then took Carter to the sheriff's department. There was no warrant for Carter's arrest at this time, but the investigator testified that Carter went along voluntarily, and that he just "gave him a ride, more or less."
¶ 5. After reaching the sheriff's department, officers read Carter his Miranda warnings, after which he signed a waiver of rights form. At this time, Carter gave an oral statement to police that "the charge was false, because [he] never actually stuck his penis in her vagina." He admitted, however, that he "had his clothes off . . . and that she had her clothes off except for her panties. . . . And she rubbed against [him] and [he] ejaculated." Carter additionally made further statements concerning the sexual encounter in the woods. During a suppression hearing at trial, Carter testified that other statements made during the first interrogation were untrue. The next day, police again questioned Carter concerning the incidents with D.B., and he gave a written confession detailing both the incident in the woods and the bedroom incident.
¶ 6. Following a jury trial in the Circuit Court of Lauderdale County, Carter was convicted of one count of sexual battery and one count of statutory rape. He received a thirty-year sentence for each count, to run concurrently, in the custody of the MDOC. Aggrieved, Carter appeals, asserting: (1) that he was denied a fair trial, the right to confrontation, and due process due to violation of his rights because of the indictment's failure to allege the child's age when charging him with a sexual offense against a child; (3) that he was denied a fair trial because the State failed to disclose lay witnesses; (4) that the trial court erred in allowing the State to use a "send a message" argument during its closing argument; (5) that he was denied effective assistance of counsel; and (6) that he was denied a fundamentally fair trial when jurors, during voir dire, expressed revulsion over the charge of sexual acts with a small child.

ISSUES AND ANALYSIS
I. Whether Carter was denied a fair trial, the right to confrontation, and due process of law resulting in a violation of his rights to silence and counsel when his statement was admitted.
¶ 7. Carter first asserts that his confession was not voluntary, and that he was denied his right to remain silent and to counsel because he was not allowed an attorney when he requested one on August 11 and 12, 2003. He argues that officers persuaded him to give a statement by promising him a plea bargain, and that he was further coerced by the officers' use of "good cop/bad cop" in the interview. He additionally argues that officers lied about false DNA evidence to frighten him.
¶ 8. "[T]he general rule is that for a confession to be admissible it must be given voluntarily and not given because of promises, threats or inducements." Dancer v. State, 721 So.2d 583, 587(¶ 17) (Miss. 1998) (citing Morgan v. State, 681 So.2d 82, 86 (Miss.1996); Chase v. State, 645 So.2d 829, 838-39 (Miss.1994)). The prosecution has the burden of proving the voluntariness of the confession beyond a reasonable doubt. Morgan, 681 So.2d at 86. Testimony of an officer, or of other persons having knowledge of the facts, meets this burden and establishes a prima facie case "that the confession was voluntarily made without threats, coercion, or offer of reward" when the officer testifies. Chase, 645 So.2d at 838 (quoting Cox v. State, 586 So.2d 761, 763 (Miss.1991)).
¶ 9. The court heard conflicting evidence on the issue of voluntariness of Carter's *956 confession. After hearing testimony, during a suppression hearing, from Carter and both officers, the judge stated:
Well, the burden on the State, before any confession can be admitted into evidence, must be proven beyond a reasonable doubt that this confession was given freely and voluntarily without any threats, coercion, promises. I have listened to this evidence presented, and there are conflicts in this testimony. But what is uncontradicted is: Number One, when the defendant was brought down to the sheriff's department, he was cooperative in nature; he signed a waiver of his rights; he was read his Miranda rights and signed a waiver of those Miranda rights. Whatever he said, whatever that may be, it wasn't taped; it was an oral statement. One officer said he didn't say anything. The other said he gave an oral confession and it wasn't taken down. Whatever was said on that date is admissible in the Court's opinion, because it was not made as a result of any threats, coercion, or promises. He was taken to the jail while there is an ongoing further investigation going on. He was brought back, re-interrogated on August 12th. Again, from everyone, he was cooperative, his attitude had not changed. At that time, he was again read his Miranda rights and then again he signed them, stating that he was willing to talk. After a period of interrogation orally, they gave him a pen or pencil, and he wrote a four-page statement in his own writing. He made corrections. He read over his statement and made corrections to make sure what he wrote was accurate.
. . . I think it is very clear, right or wrong, that when Mr. Carter wrote this statement it was the intent and the purpose of the writing of the statement to show that: he did not force the victim to have sex with him; and, Number Two, he did not hurt her, while whatever he did as he admitted in his statement. That was imperative. That was on this defendant's mind. What he didn't know is that because of the age of the victim, consent was not even a legal issue; she couldn't give consent. So in effect, he was confessing and didn't even know it. Then he goes back to his cell and gets these cases and sees how these other suppressions, confessions are being suppressed, and then he changes his story, which frankly, his testimony he said today, in my opinion, is incredible.
I don't believe there was any coercion. I don't believe there were any threats of both officers that were present during the entirety or during part of his interrogation, have testified. Mr. Carter has made some allegations that there was some beating on tables, yelling in his ear, whatever, and then in his next breath he said he got this out of cases that he read. The only thing that will come close to a promise  well, they asked  during the time that he was writing down his statement, he started thinking about, Well, what sentence does this carry? And the officers didn't know. They gave him a range. Even though this range wasn't right, he knew that he could get up to 30 years, which is within the possibility of  and he kept on writing. He didn't stop or tear it up. So that didn't influence him in any way. No one made a promise to him if he told the truth he would get a lenient sentence, a specific lenient sentence and one year of counseling. Nobody told him that. That would be incredible. That's not believable.
As to whether if he told the truth he could get a plea bargain agreement, obviously, a plea bargain agreement is less than a maximum. In this case, it's 20 *957 years up to life. But in his mind, if he had heard the year 30 years, anything less than that could have been part of a plea bargain agreement. He was already writing his statement when that discussion took place. I don't feel like that influenced him in starting writing that statement. I think it's obvious to the Court that what influenced him in making that statement is that he felt that if he wrote this statement, which is Exhibit 1 to this motion hearing, it was going to absolve him from any liability in this case. What he didn't know is his interpretation of the law of what he thought it was was entirely erroneous. So I'm not going to suppress the statement.
¶ 10. A trial judge's determination of whether or not a confession is admissible against a defendant is essentially a factual finding and will not be disturbed on appeal so long as the judge applies the correct legal standard, and the decision is not clearly erroneous or contrary to the overwhelming weight of the evidence. Dancer, 721 So.2d at 587(¶ 18) (citing Alexander v. State, 610 So.2d 320, 326 (Miss.1992); Stokes v. State, 548 So.2d 118, 122 (Miss.1989)). Where, on conflicting evidence, the lower court admits a statement into evidence this Court generally must affirm. Morgan, 681 So.2d at 87 (citations omitted).
¶ 11. In the case sub judice, the trial judge clearly applied the correct legal standard. We do not find his decision to admit the confession into evidence against Carter to be clearly erroneous or against the overwhelming weight of evidence. Carter's arguments concerning threats, coercion, promises and denial of counsel appear in the trial transcript to have been largely fabricated and the product of Carter's legal research in jail. We therefore find this issue to be without merit.
II. Whether the trial court erred when, during the suppression hearing, it inquired into the truthfulness of his statement to police.
¶ 12. Carter contends that he was denied his right to remain silent, counsel, due process of law, and to a fair trial when asked, during his suppression hearing, about the truthfulness of his statements to police. When attempting, during a suppression hearing, to determine whether or not a confession was voluntary, the focus is not on the truthfulness of the confession, but rather on the behavior of law enforcement officials, i.e., whether they coerced, threatened, or made promises to the defendant in order to induce a confession. See Rhone v. State, 254 So.2d 750, 753-54 (Miss.1971).
¶ 13. In the case sub judice, Carter's testimony during the suppression hearing was persistently evasive and inconsistent. Much of the inquiry into truthfulness occurred as a result of impeaching Carter and attempting to ascertain his credibility. While attempting to refute Carter's testimony that police told him what to write, however, the State pursued a line of questioning inquiring directly into the truth of the confession. Nonetheless, the trial judge made no reference to the truthfulness of the confession in denying the motion to suppress, and we see nothing in the record indicating that such line of questioning influenced his decision.
¶ 14. In a similar case, Powell v. State, 540 So.2d 13, 15-16 (Miss.1989), our supreme court stated:
In this case there was extensive and impermissible cross-examination concerning the truthfulness of [the defendant]'s statement. The Circuit Court in *958 the end made detailed findings of the fact that [the defendant] had been Miranda warned and had knowingly and voluntarily waived his right to remain silent. The statement accordingly was held admissible. Among those findings we find no reference to the statement's truthfulness. Once the confession is before the jury, it is no longer impermissible  cross-examination about the credibility of the confession becomes a key jury question. The error in receiving the testimony on truthfulness at the suppression hearing does not require reversal.
(footnote omitted). Because we are not persuaded that the judge impermissibly considered the truthfulness of the confession in deciding its admissibility, we find no error. This issue is without merit.
III. Whether Carter was denied due process of law because of the indictment's failure to allege the age in a sexual offense against a child.
¶ 15. Both indictments clearly state Carter's date of birth and D.B.'s date of birth. This issue is wholly without merit.
IV. Whether Carter was denied a fair trial because of the State's failure to disclose lay witnesses.
¶ 16. Carter asserts that he had not disclosure of the State's intent to call K.B. to the stand, and that he was thus "blind sided by the total absence of disclosures by the State." He further asserts that his interrogation by the investigators was taped-recorded, and "this item was never disclosed to the defense." The record reveals that the State questioned K.B. only as to D.B.'s age, whether she took D.B. to Wesley house to be interviewed, how the interview was documented, and whether the videotaped copy of the interview accurately depicted what happened at the interview. The only other testimony by K.B. concerned additional foundational information as to the fact that D.B. was spending time with her uncles and family in August of 2003, as well as the location of her grandmother's house. The State asserted to the judge that all of that information was contained in the discovery, and the judge thus allowed her testimony.
¶ 17. Carter additionally argues the continuance requested by his trial counsel during cross-examination of K.B. should have been granted. The following exchange occurred during the cross-examination of K.B. by Carter's trial counsel:
Q. [K.B.], have you spoken to either law enforcement or any member of the DA's office, or investigators, or any of the DA's up there prior to today about this matter?
A. Only when I came down for trial. But, you know, when they canceled the trial and stuff. Other than that . . .
Q. Okay. And you've never spoke to any law enforcement officer or any deputy sheriff or anybody about this?
A. Yes, when it happened.
Q. Okay. And who did you speak to?
A. I don't remember his name. He was at the hospital. It was the child welfare and the sheriff was at the hospital.
Q. Was it a deputy?
A. If I am not mistaken it was.
Q. And did he ask you questions about what had happened to [D.B.] or what [D.B.] told you?
A. He asked [D.B.] questions. He also asked me questions. I explained to him the same thing she did.
Q. And I assume, you responded to him?

*959 A. Yes.
BY [DEFENSE COUNSEL]: Judge, at this time, I mean, I request a continuance until I get that statement. I mean, I have not been provided that statement.
BY THE COURT: We'll take it up during the lunch. Is that a written statement?
BY [DEFENSE COUNSEL]: Judge, of course, discovery is oral statements, also, not reduced to writing.
BY THE COURT: I don't know who to get it from.
BY [DEFENSE COUNSEL]: The deputy 
Q. Was it the same deputy that went to Wesley House and told y'all to go to Wesley House?
A. Yes.
Q. Do you know whether or not that was Deputy Graham? Does that sound familiar?
A. I don't know.
Q. Or would you 
A. I would know him if I saw him.
Q. Okay. You seen him around here today?
A. No.
Q. Or upstairs or anything?
A. No.
Q. But you did a give a statement to a member of the Lauderdale County Sheriff's Department regarding this case?
A. Yes.
BY [DEFENSE COUNSEL]: Judge, once again, you know, I request not to go on until I know what she said in that statement. I mean, it's up to them to give me these statements, and they know who it is.
BY [PROSECUTION]: Your Honor, if it please the Court. This is witness  this is not an occurrence witness. I mean, she has given, you know, background information that is contained in the file, the date of birth of her child. All she has done is authenticate a tape, that was done in her presence. And the only other thing she has done was given information about the relationship between these people. That is not to my understanding, Judge, in any way written down as a formal statement of this witness; however, all of that information is contained in discovery.
BY THE COURT: All right. Well, it's 11:25. What I am going to do is let the jury go ahead and go to lunch. We'll contact Mr. Graham. And if he recalls what this witness said, let him write it down, a summary of what she said, and tender it to [defense counsel].
. . . .
BY THE COURT: Let the record reflect that we're still outside the presence of the jury. [Defense counsel], I have been given a copy of, I guess, a written summary of a statement by Kenneth Graham. Have you received that?
BY [DEFENSE COUNSEL]: Yes, sir.
. . . .
BY THE COURT: All right. [Defense counsel], you, as well as the Court, have now received a summary of Mr. Andy's Hatcher's statement. Have you got that?
BY [DEFENSE COUNSEL]: Yes, sir.
BY THE COURT: Are you ready to proceed?
BY [DEFENSE COUNSEL]: Yes, sir.
¶ 18. "The admissibility of evidence is within the sound discretion of the trial judge." Stewart v. State, 881 So.2d 919, 924(¶ 17) (Miss.Ct.App.2004) (citing Crawford v. State, 754 So.2d 1211, 1215(¶ 17) (Miss.2000) (overruled on other grounds)). Rather than following a bright line rule with regard to reviewing a trial judge's denial of a continuance, we look to *960 the facts of each case. Hooker v. State, 716 So.2d 1104, 1113(¶ 36) (Miss.1998).
¶ 19. Neither of the instances cited by Carter above constitute abuses of discretion by the trial judge. He let in K.B.'s testimony in order to establish foundational facts, which was fully within its discretion. As to the failure to grant continuance, there is no issue, as Carter's trial counsel clearly stated that, after he received Graham's written statement during recess, he was ready to proceed. Consequently, we find this issue to be without merit.
V. Whether the trial court erred in allowing the State's "send a message" argument.
¶ 20. Carter asserts that the trial judge erred by overruling his trial counsel's objection in the following instance during the State's closing argument:
BY [PROSECUTION]:. . . . [T]he people of Lauderdale County, ladies and gentlemen, you know, the people of Lauderdale County certainly deserve justice.
BY [DEFENSE COUNSEL]: Judge, I object to that sending-a-message thing. That's improper.
BY [PROSECUTION]: That's not to send a message, Judge.
BY [DEFENSE COUNSEL]: They're not concerned with the people of Lauderdale County, Judge. This jury is concerned with justice, not the people of Lauderdale County. That's an improper argument.
BY [PROSECUTION]: No, sir. I am saying that the people of Lauderdale County want justice. That is what I said.
BY THE COURT: All right. Overruled.
¶ 21. In Lee v. State, 858 So.2d 124 (Miss.2003), the Mississippi Supreme Court rejected a similar argument. In Lee, the prosecutor stated during closing argument, "She is looking to you for justice and the people of Wayne County are looking to you to make this, their streets safer. I mean we cannot have somebody that is going to do this on the streets of Wayne County." Lee, 858 So.2d at 128(¶ 18). The supreme court stated that the comment "was not so egregious as to require reversal." Id. at (¶ 19). "[T]he standard to warrant reversal is `whether the error affected a trial in such a way as to bring its fairness into question.'" Id. at 128-29(¶ 10) (citing Payton v. State, 785 So.2d 267, 271(¶ 13) (Miss.1999)).
¶ 22. We find that, in the case sub judice, the comment by the State in its closing argument in no way brought the trial's fairness into question. We therefore affirm the decision of the trial court with respect to this issue.
VI. Whether Carter was denied a fundamentally fair trial when jurors, during voir dire, expressed revulsion over the charge of sexual acts with a small child.
¶ 23. Carter argues that the jury panel was "tainted" by the oral reactions of several jurors during voir dire, expressing revulsion at the nature of the charge. The following exchange took place during voir dire by the judge:
Q. Okay. All right. Thank you, ma'am. Is there anything about the nature of this type case, the fact that it's a statutory rape and a sexual battery case, that you feel like might affect you somehow in this particular type case? Would y'all stand up please? Don't raise your hand. If you will stand up. If you are going to respond to that, would you stand up? *961 Didn't somebody else raise their hand? Would you hold your numbers up, please? Juror 30. . . .
A. [By Juror 30] Yes. I don't know. I am just sitting here kind of repulsed by the whole thing, but I will try to be fair. But, you know, I just feel like I needed to voice that.
Q. Well, that is an honest answer, and I can appreciate that, because I don't think anyone enjoys, you know, sitting on, you know, rape cases or sex cases. But my questions, I want to go a little bit farther, and you've told me your feelings, and I understand those. But do you feel like you can keep an open mind and listen to the evidence in reaching a fair and impartial verdict? Do you think you can do that? Or do you think that your feelings are just too strong that it would prohibit you from doing that?
A. I would like to  I would like to believe that I could be fair and impartial.
Q. You are just not sure?
A. I am not sure.
Q. Okay.
A. I am just kind of  trying to be honest.
Q. That's fine. Thank you, ma'am. I can't see your jury number. Juror 32 . . .
A. [By Juror 32] Yes, sir. I had someone in my family that had the same thing done to them, but, I mean, I am against it, you know, and everything and I don't know if I could  you know, because it done happened to somebody in my family that was close to me.
Q. So because of your personal experience in your family you feel like that might affect you as a juror?
A. Yeah.
During voir dire by Carter's trial counsel, the following questions were asked:
Q. . . . [A]nybody here feel that Mr. Carter is guilty simply because he is sitting there? Anybody who feels that, feels that way?
(NO RESPONSE)
Q. All right. Because of the nature of this case, obviously, this is going to be graphic testimony, graphic statements, and so forth. Is there anybody who feels that they simply can't listen to that?
(NO RESPONSE)
. . . .
Q. . . . [A]s jurors, . . . you understand that you have to wait until everything is over in order to make up your mind? Is there anyone here who feels that they can't wait until they've heard all the evidence before they make up their mind?
(NO RESPONSE)
. . . .
Q. . . . [I]f they do not prove penetration but they do prove fondling, is anybody here who is going to say, I don't care whether they actually proved this case, the sexual battery and rape, I don't care whether they proved it or not, I am still finding him guilty because he did those other things? You will find him guilty of sexual battery or rape?
A. [By Juror 39] I will probably have a hard time with it. If he done part of it, you know, then I will have a hard time with it. I am just being honest.
Q. Okay. Thank you. Is there anybody else who, again feels that way? Juror 39. Okay.

*962 A. [By Juror 39] I would just say, Keep your hands to yourself, about fondling or anything else.
. . . .
A. [By Juror 39] I won't be able to participate.
¶ 24. Jurors 30, 32, and 39 were struck from the panel for cause, as were other jurors who had instances of sexual abuse in their families. Hence, they did not serve on the jury which convicted Carter. "While a comment by a single prospective juror during voir dire may taint the entire panel, where there is no evidence of such a taint, the court may correctly refuse to disqualify the entire panel from service if the jury affirms that it can render a verdict based solely on the evidence brought before the court." Young v. State, 831 So.2d 585, 589(¶ 11) (Miss.Ct.App.2002) (citing Holland v. State, 705 So.2d 307, 339-40 (¶¶ 119-23) (Miss.1997)). There is a presumption in Mississippi that juries have followed the instructions of the trial judge. Young, 831 So.2d at 589(¶ 11) (citing Ragin v. State, 724 So.2d 901, 904(¶ 13) (Miss.1998)).
¶ 25. Carter has provided no further evidence beyond the mere assertion that his trial was fundamentally unfair because of prospective jurors' expressions of revulsion. However, those prospective jurors did not serve on the jury that convicted Carter, and we find nothing in the record to indicate that the jury panel was tainted by their remarks. We find this issue to be without merit.
VII. Whether Carter was denied effective assistance of counsel.
¶ 26. Carter asserts that he was denied effective assistance of counsel when his trial counsel: (a) failed to object to numerous leading questions propounded to all the State's witnesses; (b) failed to insist upon a continuance when the State made inadequate disclosure of its case; (c) failed to obtain an instruction for the voluntariness of the confession; (d) did not ask for a mistrial and get a ruling of inflammatory remarks of the members of the jury panels; and (e) failed to object to a hearsay statement in the State's closing argument concerning the doctor's examination of D.B.
¶ 27. Mississippi uses the test for ineffective assistance of counsel announced by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Alexander v. State, 605 So.2d 1170, 1173 (Miss.1992). Strickland requires the defendant to prove that, considering the totality of the circumstances, (1) trial counsel's performance was deficient, and (2) defendant was prejudiced as a result. Colenburg v. State, 735 So.2d 1099, 1103 (¶ 9) (Miss.Ct.App.1999). "The defendant must show that but for his attorney's errors, there is a reasonable probability[2] that he would have received a different result in the trial court." Id. "A strong but rebuttable presumption, that counsel's performance falls within the wide range of reasonable professional assistance, exists." Id. "Scrutiny of counsel's performance by this Court must be deferential." Id.; see also Ahmad v. State, 603 So.2d 843, 848 (Miss. 1992) (discussing scope of review on appeal for counsel's performance). "Having a trial strategy negates an ineffective assistance of counsel claim, regardless of counsel's *963 insufficiencies." Hall, 735 So.2d at 1127(¶ 10) (Miss.Ct.App.1999).
(a) Leading questions
¶ 28. Carter contends that his trial counsel failed to object to at least five leading questions during direct examination of K.B. As stated previously, the testimony of K.B. was largely foundational, and any leading questions did not lead to the admission of any evidence that would otherwise be inadmissible. Carter has failed to carry his burden in persuading this Court that his trial counsel's lack of objection to leading questions during K.B.'s direct examination fell outside the broad range of reasonable professional assistance or trial strategy.
(b) Continuance
¶ 29. As discussed previously, any potential need for continuance was obviously remedied when Graham's statement was made available to Carter's trial counsel during the recess. Carter's trial counsel stated that he was then ready to proceed, making it clear that a continuance was no longer required. Carter has failed to meet his burden on this assignment of ineffectiveness.
(c) Voluntariness instruction
¶ 30. Carter asserts that his trial counsel erred by failing to obtain a jury instruction concerning the voluntariness of his confession. He fails, however, to even suggest that this was not a matter of trial strategy or reasonable professional assistance. He therefore fails to meet his burden on this issue.
(d) Inflammatory remarks
¶ 31. As discussed above, Carter asserts that his trial counsel provided ineffective assistance by failing to ask for a mistrial when prospective jurors expressed revulsion, during voir dire, at the nature of the charge. Again, Carter provides nothing beyond the mere assertion that this was error. The remarking prospective jurors did not serve on the jury that convicted Carter, and there is nothing in the record suggesting that their remarks tainted the remaining jury panel. Carter fails to meet his burden.
(e) Hearsay statement
¶ 32. Carter asserts that counsel failed to object to a hearsay statement during closing argument, but our only clues as to what that statement might be are Carter's mention of "Failure to Object during State's Closing on Hearsay of Doctor's Examination" in this heading, and "This argument was made to prove `penetration,' the essential distinguishing element of course both of statutory rape and sexual battery." It is difficult to discern what statement Carter is referring to in the State's closing argument, as he does not specifically point it out in his brief. The only section in which medical testimony is even mentioned is in the following section of the State's closing argument:
And you will see [Carter] says on the third page [of his confession]: "I never forced my penis into her vagina. I never tried to force it." And then he says: "I never penetrated her. I never even tried to penetrate her." Well, but then you read the rest of it and see, well you know, he is saying that on one occasion that he basically, forced his hand into her. What is that? That's not penetration? On another occasion, he might have scraped her vagina with his finger.
There is no reference to a doctor's examination in this passage, nor anywhere else in closing argument by the State. However, even if we were to find such a statement was made, the decision whether or not to object to hearsay falls within the *964 broad discretion given to counsel in formulating and carrying out his trial strategy. Carter once again fails to meet the burden set forth by Strickland.
¶ 33. Neither individually nor cumulatively do these alleged "errors" by counsel constitute ineffective assistance of counsel. Because Carter fails to meet his burden with regard to either deficiency of counsel's performance or subsequent prejudice, this issue is without merit.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY OF CONVICTION OF STATUTORY RAPE, WITH SENTENCE OF THIRTY YEARS, AND CONVICTION OF SEXUAL BATTERY, WITH SENTENCE OF THIRTY YEARS, BOTH SENTENCES TO BE SERVED CONCURRENTLY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAUDERDALE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS AND BARNES, JJ., CONCUR. ROBERTS, J., NOT PARTICIPATING.
NOTES
[1] D.B. testified that Carter "did it again" in his bedroom at her grandmother's house, thought it is not precisely clear at what point in time this occurred.
[2] "A `reasonable probability' is one sufficient to undermine confidence in the outcome of the proceeding." Hall v. State, 735 So.2d 1124, 1127(¶ 7) (Miss.Ct.App.1999) (citing Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Conner v. State, 684 So.2d 608, 610 (Miss. 1996)).