610 So.2d 320 (1992)
Stephanie Lynn ALEXANDER
v.
STATE of Mississippi.
No. 89-KA-0948.
Supreme Court of Mississippi.
September 10, 1992.
Rehearing Denied January 21, 1993.
*322 Gerald W. Chatham, Sr., Hernando, for appellant.
Michael C. Moore, Atty. Gen., W. Glenn Watts, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and PITTMAN, and BANKS, JJ.
PITTMAN, Justice, for the Court:
On January 25, 1988, Stephanie Lynn Alexander, a young college co-ed from Hernando, *323 Mississippi, was convicted of killing her dormitory suitemate, Stacey Dianne Pannell, who was from Ripley, Mississippi. Alexander appeals to this Court. We affirm the conviction and sentence of Alexander after a careful inquiry into the numerous challenges raised on appeal by Alexander, to wit: (1) the trial court's denial of a motion to suppress incriminating statements and allowing said statements into evidence even though Alexander claimed they were made after the use of hypnosis; (2) exclusion of defense questioning propounded to a witness about why the witness had refused to talk to the defense attorney prior to trial; (3) restriction of defense examination of the state medical examiner concerning an FBI profile; (4) restriction of defense examination of a law enforcement officer concerning a newspaper article about his involvement in the case; (5) the trial court's refusal to declare a particular witness as "hostile;" (6) admission into evidence of the fact that Alexander was pregnant at the time she was arrested; (7) the exclusion of certain testimony and tests of a witness, Alexander's psychologist after her arrest, such as a demonstration in the courtroom of how easily the defendant could be hypnotized and his personal opinion about the case, even though the court did allow a videotape of a hypnosis of Alexander; (8) the trial court's prohibition of defense counsel from calling a witness who was not on the witness list supplied to the state; (9) admission into evidence of a gruesome autopsy photograph depicting the victim's opened skull; and (10) the trial court's allowance of a prosecutorial comment during closing argument that could be construed to reflect on Alexander's right to remain silent.

I.
In the early morning hours of October 8, 1985, the body of eighteen-year-old freshman Stacey Dianne Pannell was found in her dormitory room at Northeast Mississippi Junior College in Booneville, Mississippi. Pannell's body was discovered by her roommate, Amy Wheeler. Wheeler arrived at her dormitory room and discovered that the door was locked and that Pannell did not answer her knocks. Since she didn't have her key with her, Wheeler knocked on the door of the next room where Alexander lived. Alexander sleepily answered Wheeler's knocks and let her into the room so that Wheeler could pass through the adjoining bathroom of the two rooms and get into her own dormitory room. Upon entering her own dormitory room, Wheeler saw Pannell's partially nude body on a bed. Wheeler approached the bed with Alexander a few inches behind her. Even in the dim light, Wheeler saw blood on the pillow and Pannell's panties pulled down around the knees of both legs. Upset, Wheeler ran out of the room through her own door and into the hallway in order to get help.
Another resident of the dormitory, Belinda Posey, went to check on Pannell at Wheeler's request. Posey found Pannell's door locked again and had to enter through Alexander's room. After seeing Pannell's body, Posey left to find the "dorm mother".
When the "dorm mother", Edna Snyder, went to check on Pannell, she found Pannell's door locked and got a security guard to unlock it for her. Snyder found Pannel's body with the panties around the calf of only one leg.
Investigators documented the scene. Pannell was lying with her back on the bed. She had her left leg resting on the bed and right foot resting on the floor. She was partially covered with bed linens and was nude from the waist down. A pair of panties was pulled down around her lower left leg. A pillow had been placed over her head. Pannell had severe injuries to the left side of her head and there was a great amount of blood on her head and on the pillow next to her head. There were blood splatters throughout the room on the walls and ceiling and as far away as nine (9) feet from the body of Pannell. A drill rifle was lying on the floor with a towel wrapped around the barrel end. There was blood on the stock or handle of the drill rifle. A hole, 8-10 inches long and 8-10 inches wide, had been cut out of the window screen.
*324 The Mississippi Highway Patrol hunted almost a year for Pannell's killer.[1] About 15 different investigators worked on the case. The detectives called in Steve Rhoads, the police chief of East Hazel Crest, Illinois, who often lectured at seminars for law enforcement personnel about a special interrogation technique known as Neuro-Linguistic Programming.
Rhoads questioned those around the crime scene. On September 18, 1986, Rhoads questioned Stephanie Lynn Alexander, a suitemate of Pannell. She confessed.
Alexander signed three statements confessing to the killing of Pannell. She signed one statement on September 18, 1986. She signed another statement on September 19 while in the Union County Sheriff's Office in New Albany, Mississippi, giving additional information. While being kept in the Lee County Jail on September 21, she signed a third statement similar to the first two.
On September 21, while in jail, Alexander wrote an eleven-page letter to Randy Price, a boy she had been dating for about a week, in which she confessed to the crime and described the circumstances surrounding the killing. Alexander told Price that she "didn't mean to do it... . It was an accident." She explained to Price that she had been heavily sedated and had had a mental block about the killing. She wrote that she hadn't been able to remember killing Pannell before but had had nightmares about the killing. Alexander told Price that she hadn't known what she was doing at the time.
The gravamen of Alexander's confession is that she was doing homework on October 7, 1985, in her room and took three (3) codeine tablets sometime between 9:00 p.m. and 10:30 p.m. because of pain from an ovary infection. Alexander had been out earlier in the evening playing cards and visiting friends, including Tommy Osborne. She walked back to her dorm room alone to do homework. Alexander dozed off after taking the codeine. She woke up around 12:30 a.m. when she heard Pannell and some other girls returning home, which was the adjacent room. The girls were helping Pannell get to her room because she had been drinking. She heard Pannell say, "Tommy O. is so fine I could ____ his brains out." Alexander asked them to be quiet, and the girls helping Pannell left. Alexander couldn't go back to sleep so she went back to Pannell's room to talk. Alexander asked Pannell if she had fun that night. Pannell said she did. They talked about Tommy Osborne whom Pannell had been dating. They talked about a boy Alexander had been dating. They talked about Tommy Osborne again. Pannell asked Alexander what she thought about Tommy Osborne. Alexander said she thought he was "fine." Pannell told Alexander, "You had better stay the hell away from him. I'm tired of you and your ____ing room." Pannell was standing in front of the mirror and pointed her finger in Alexander's face. Alexander mentioned Tommy Osborne again. Pannell slapped Alexander. Alexander called Pannell a "bitch" and slapped her. Pannell told Alexander, "I'd better not see you hanging around him. I'll kill you. Do you hear me?" Pannell slapped Alexander again. Pannell put her hands around Alexander's throat. Alexander kicked her to get her away. Pannell fell onto the bed and started to get up towards Alexander. Alexander had been twirling Pannell's drill rifle while they were talking and had laid it back down against Pannell's bed. Alexander picked up the drill rifle and hit Pannell. Pannell fell back onto the bed. Pannell started towards Alexander again and called her a "____ing bitch." Alexander hit her again with the drill rifle. When Pannell fell back on the bed, Alexander hit her three more times with the drill rifle.
The confession continued. Alexander was "out of it" because of the codeine and *325 didn't know what to do. The rifle fell out of Alexander's hand, and she locked the door to the hall, washed her hands in the sink, and put a pillow over Pannell's head. Alexander got a steak knife that Pannell had borrowed from Alexander out of a drawer and cut the screen so the scene would look like someone had come through the window. She pulled Pannell's panties down so that it would appear as a rape and wiped off part of the drill rifle. Alexander then took a bath and burned the screen that she had cut out and the shirt she had been wearing in the commode of the bathroom adjoining the two rooms. Smoke was in the bathroom, so Alexander sprayed some of Amy Wheeler's perfume in the bathroom. Alexander went back to bed and slept.
Alexander was charged with Pannell's murder following her confession to the investigators.
Claiming innocence, Alexander contended that the confessions had been the product of hypnotic suggestion and were thus inadmissible. Alexander claimed that the authorities had been desperate to solve the case and planted the story in her mind that she had killed Pannell. Judge Thomas J. Gardner, III of the Prentiss County Circuit Court held a three-day hearing in June, 1987, to determine if the statements made by Alexander to the investigators and in a letter to Price were voluntary or if they were made due to coercion, threats, or promises of leniency, or hypnotic suggestion. During the suppression hearing, the court heard from everyone who was present when Alexander confessed.
The trial judge overruled Alexander's motion to suppress the statements given to law enforcement officers and the letter written to Price while she was in custody. The court found "beyond a reasonable doubt" that Alexander was at no time hypnotized during the sessions with school psychologist Dr. Morris; that Alexander was properly advised of her rights, that she was not under the influence of hypnosis at any time when she made confessional statements, that Alexander acted voluntarily at all times pertinent to the confession.
A change of venue was granted Alexander due to publicity and the trial began on January 4, 1988. The jury heard 32 witnesses and reviewed 90 pieces of evidence. On January 25, 1988, the jury deliberated for about one hour 50 minutes and returned a verdict of guilty of manslaughter. Judge Gardner sentenced Alexander to twenty years in the custody of the Mississippi Department of Corrections.

II.

THE TRIAL COURT DID NOT ERR IN OVERRULING THE MOTION TO SUPPRESS INCRIMINATING STATEMENTS AND ALLOWING SAME INTO EVIDENCE.
Alexander contends that the court's ruling at the end of the suppression hearing wherein the trial judge overruled Alexander's Motion to Suppress was in error because the State investigators improperly coerced her to make incriminating statements by the use of hypnosis and because she did not understand her rights due to hypnotic influence and the effects of post traumatic stress syndrome. Alexander bases this contention on the entire testimony of her psychologists, Dr. Guild and Dr. Stanley, Rhoads' admitted familiarity with hypnosis, testimony of her friend Belinda Posey that Alexander was "out of it" after seeing Dr. Morris, the school psychologist, and Dr. Morris's admission that he did in fact attempt hypnosis with Alexander at their last session.
When the voluntariness of a confession is at issue, the prosecution has the burden of offering a prima facie case of admissibility which, when rebutted by the defendant, then requires that the prosecution offer all witnesses to the confession. The accused offers testimony of inducement. See, e.g., Stokes v. State, 548 So.2d 118, 121 (Miss. 1989); Agee v. State, 185 So.2d 671, 673 (Miss. 1966). The accused is entitled to a preliminary hearing on admissibility. Agee, 185 So.2d at 673. And the prosecution bears the beyond-a-reasonable-doubt burden of proof. Stokes, 548 So.2d at 122.
*326 According to the Stokes court, when the circuit court expressly or implicitly resolves the issue of admissibility of a confession against a defendant, this Court's scope of review is confined to established limits. Id. Addressing whether a confession to murder was voluntarily given, this Court stated:
This is essentially a fact-finding function. Neal v. State, 451 So.2d 743, 753 (Miss. 1984). So long as the court applies the correct legal standards, "we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous." See, e.g., Woodward v. State, 533 So.2d 418, 427 (Miss. 1988); Hall v. State, 427 So.2d 957, 960 (Miss. 1983); Ratliff v. State, 317 So.2d 403, 405 (Miss. 1975); cf. Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983); Jones v. State, 461 So.2d 686, 697 (Miss. 1984). Where, on conflicting evidence, the court makes such findings, this Court generally must affirm.
Stokes, 548 So.2d at 122. Thus, the trial judge's finding that Alexander's statements were voluntarily given is a finding of fact that cannot be reversed unless he applied an incorrect legal standard or his order is clearly erroneous.
Mississippi law regarding the use or incidence of hypnosis is sparse. (The presence of hypnosis was first brought before this Court in 1965. This Court affirmed a conviction where the defendant was found guilty of violating the "Peeping Tom" statute and the defendant claimed he was acting under the influence of "sweetened water" which hypnotized him. Riley v. State, 254 Miss. 86, 180 So.2d 321, 324 (1965)).
While this Court rarely considers the role that hypnosis should play in the courtroom, hypnosis has apparently been used by law enforcement officers in this state for several years. This Court has upheld a search warrant based on a child's statement after "minor hypnosis" where the child had witnessed her own mother's death by shooting and then watched the killer burn down the house. Depreo v. State, 407 So.2d 102, 107 (Miss. 1981).
When Gary Lambert was found unconscious due to intoxication one morning lying next to the badly bruised body of an 86-year-old woman in Seminary, Mississippi, this Court upheld the conviction where an eyewitness's testimony offered by defense counsel was questioned by the State due to his being "possessed" through hypnosis. This Court said that the record was devoid of any credible eyewitness evidence to the homicide. Lambert v. State, 462 So.2d 308, 314 (Miss. 1984).
Ironically, Dr. Stanley, the same Dr. Stanley who treated Alexander and testified on her behalf in the case sub judice, has worked extensively with the State in preparing for trials. Dr. Stanley helps witnesses remember details of a crime by the use of hypnosis. In Nixon v. State, 533 So.2d 1078 (Miss. 1987), this Court allowed the testimony of a witness who had been hypnotized by Dr. Stanley because the hypnosis failed its purpose  to produce the tag number of the van driven by the accused. The witness's testimony of her recollection was allowed. Id. at 1094.
Besides the testimonials at the suppression hearing, Alexander relies on this Court's decision in House v. State, 445 So.2d 815 (Miss. 1984). In House, this Court for the first time considered aid of a criminal prosecution by testimony adduced through the use of hypnosis. The Court was faced with a situation where an eight-year-old girl accused House of forcing her to commit unnatural sex acts. The girl had also accused at least two other male persons with committing similar acts upon her. The girl was hypnotized by a doctor. The doctor then testified as to the facts surrounding the offense as told to him and gave his opinion that the girl was telling the truth. The young girl also testified. The Court found that the hypnotist may not testify as to facts constituting the crime told him by the victim during a hypnotic session, nor may he offer an expert opinion that the victim is telling the truth. Because the hypnotically refreshed memory of the victim is susceptible of having been "contaminated" during the hypnotic session, her testimony becomes admissible *327 only after certain safeguards set forth below have been complied with. Hypnotically-refreshed testimony is not per se inadmissible. Hypnotic experience goes to weight or credibility. Id. at 824. According to House, before a witness who has had a hypnotic experience may testify in this state regarding matters explored during the hypnotic experience, the trial judge must conduct a hearing outside the presence of the jury and determine whether the following mandatory minimum safeguards have been complied with:
(1) The hypnotic session or sessions must have been administered by a licensed psychiatrist or psychologist trained in the use of hypnosis.
(2) Any information given to the hypnotist by law enforcement personnel, by the defendant or from any other source prior to the hypnotic session should be in written form and should be preserved so that subsequently the extent of the information the subject received from the hypnotist may be determined.
(3) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding any new elements to the witness' description of the events. The witness' pre-hypnotic memory should be preserved via tape recording or, if possible, video tape.
(4) The entire procedure of hypnosis and the hypnotic interview should be tape recorded or, if possible, video taped.
(5) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview.
(6) The opposing party or parties should have full access, prior to trial, to the recording of the hypnotic interview. See Rule 4.06, Miss. Uniform Criminal Rules of Circuit Court Practice.
(7) All opposing parties must be given free rein to cross-examine the hypnotically-induced witness and/or the hypnotist [footnote omitted] regarding the witness' memory and the particular procedure used to refresh it.
(8) No hypnotically-enhanced statements made by a witness or victim may be received into evidence unless there is available otherwise admissible corroborating testimony or physical evidence which tends to substantiate the hypnotically-enhanced statements.
House, 445 So.2d at 826-827.
Although Alexander relies on House, it is not similar to the case at bar. House involves hypnotically refreshed memory of a witness. In House, there is no question that the witness was hypnotized. In the case at bar, there is dispute as to whether the accused was even hypnotized. It is clear from the record that Dr. Morris did attempt to hypnotize Alexander at least once during the months following the killing in order to refresh her memory as a witness. However, controversy remains as to whether hypnosis was ever achieved. If Alexander was hypnotized as a potential witness in order to refresh her memory, then the guidelines of House probably should have been followed and clearly were not. However, the issue in this case is whether Alexander was ever hypnotized at all, particularly on the days when she made her confessional statements. A determination must be made initially that Alexander was hypnotized before an analysis is made that the proper guidelines were followed. Some question would remain as to what the proper guidelines would be. Since Alexander is the accused and is not a witness for the State, would the House safeguards even apply? It is not necessary to reach an answer to this question at this point. We must first determine if the trial court's ruling that her statement was not coerced and was not made under the influence of hypnosis is correct.
There are not any reported cases in Mississippi wherein an accused claims that a confession was not voluntarily given due to the effects of hypnosis. Whether Alexander was hypnotized is the threshold determination. Since this is a question of fact, the ruling of the trial judge should be upheld unless there is clear error. There is no evidence of clear error in the case at bar. The trial judge held a full three-day hearing on this question alone satisfying the Agee requirement. See Agee, 185 So.2d *328 at 673. All of the law enforcement personnel present at the time of Alexander's statements testified as well as the psychologists and psychiatrists who treated or examined her before and after the time the statements were made. Stokes requires that all witnesses to a confession offer testimony when voluntariness is at issue. See Stokes, 548 So.2d at 121. The witnesses to Alexander's confessions testified at the suppression hearing. The trial judge thus used the correct legal standard in his determination. Judge Gardner made the requisite finding beyond a reasonable doubt that Alexander voluntarily made the confessional statements and wrote the letter. See Id. at 122. Alexander's offer of proof that she was hypnotized conflicts with the States's evidence. Pursuant to Stokes, where there is conflicting evidence but a finding of fact by the lower court that is not clearly erroneous, this Court must affirm the lower court. Id.
Since the trial judge used the correct legal standard and found the statements admissible, there is no clear error rendering the judgment reversible on this issue. Further the court's finding is not contrary to the overwhelming weight of the evidence nor is it manifest error as mentioned in McCarty v. State, 554 So.2d 909, 911-912 (Miss. 1989). The Court found that the statements were given free and voluntary, that the defendant was given a "Miranda warning", and that the defendant was competent to give the statements.

III.

THE TRIAL COURT DID NOT ERR IN SUSTAINING THE PROSECUTION'S OBJECTION TO DEFENSE QUESTIONS ABOUT WHY THE WITNESS AMY WHEELER HAD NOT DISCUSSED THE CASE PRIOR TO TRIAL.
Alexander contends that the trial judge erred in sustaining the prosecutor's objection to defense counsel's cross examination of Pannell's roommate, Amy Wheeler, about why Wheeler had not talked to counsel prior to trial when the case was being investigated. Alexander argues that this action by the trial judge infringed her right to confront the witness.
The State argues that defense counsel had already asked Wheeler why she had not talked to him before trial. Wheeler told defense counsel that she thought whatever information the defense sought was available through Steve Williams. The trial judge sustained the State's objection to the continued questioning. The State contends that the questioning was properly excluded because it was repetitive and called for a legal conclusion. The questioning of Wheeler by defense counsel transpired as follows:
Q And you still refused to talk to me?
A Yes, because I knew you could get it from Steve.
Q Who told you I could get it from Steve?
A No one told me. I just figured you could. I thought  I read in the paper that you all traded stuff. What you all need, or you would need or whatever.
Q Don't you think it would have been important to Stephanie's case for me to talk to the first person who found the deceased body? Don't you think that would be important to her defense?
BY MR. YOUNG: Your Honor, I am going to object to this.
BY THE COURT: The objection will be sustained.
Alexander relies on general Mississippi law that it is impermissible to restrict cross examination which is relevant to a witness's interest and credibility, Miskelley v. State, 480 So.2d 1104, 1112 (Miss. 1986), and that wide latitude is to be allowed a defense counsel on cross examination. See Crapps v. State, 221 So.2d 722, 723 (Miss. 1969); Cody v. State, 167 Miss. 150, 166, 148 So. 627, 632 (1933).
However, in the case sub judice, the questioning was not relevant to Wheeler's credibility. In a recent case involving an almost identical assignment of error, Sayles v. State, 552 So.2d 1383 (Miss. 1989), this Court found that the trial court correctly sustained an objection to defense counsel's question to a witness dealing with the witness's refusal to speak with defense counsel because the refusal to speak with defense counsel was not relevant *329 to his "credibility" pursuant to Rule 611(b) of the Mississippi Rules of Evidence. Refusal to talk to an attorney prior to trial is not indicative of lack of veracity. Sayles, 552 So.2d at 1386-1387. Such refusal is permissible, and the witness does not have to explain her silence. We do note that the questioning of a witnesses' refusal to cooperate with the defendant's attorney may be permissible under Rule 616 to show bias but such is not the controlling rule in this instance. There is no suggestion that Wheeler was biased or hostile.
The trial judge has wide discretion when ruling on the admissibility of testimony. This Court has stated:
It is not enough to say that the judge erred in limiting the scope of cross examination unless it can be shown that the error was a reversible one. A judge has wide discretionary control over the extent of cross examination but the arbitrary curtailment upon a proper subject of cross examination may be grounds for reversal. Suan v. State, 511 So.2d 144 (Miss. 1987). Also, under M.R.E. 103(a), before error can be predicated at all upon an adverse evidentiary ruling it must appear that a substantial right of the party is affected.
Sayles, 552 So.2d at 1387.
The trial judge's ruling was correct and within his discretion in limiting cross examination of Wheeler regarding her refusal to talk to defense counsel. The questioning of Wheeler was not relevant to her credibility.
The questioning also obviously called for an impermissible legal conclusion when defense counsel asked Wheeler to determine the importance of her testimony to Alexander's case. See Miss.R.Evid. 701.

IV.

THE TRIAL COURT DID NOT ERR IN RESTRICTING THE DEFENSE'S CROSS-EXAMINATION OF DR. BENNETT, THE STATE MEDICAL EXAMINER, CONCERNING AN FBI PROFILE.
When defense counsel attempted to cross examine Dr. Thomas Bennett, the State Medical Examiner who had performed the autopsy on Pannell, regarding an FBI Profile and possible contradictions between it and conclusions of Dr. Bennett about the causation of wounds, the trial judge would not permit the cross examination. Alexander claims that this prejudiced her trial.
The State claims that testimony about the FBI profile would have included hearsay. The FBI Agent, Ronald P. Walker, who prepared the report at the FBI lab in Quantico, Virginia, was not present to testify or authenticate or be cross examined in regard to the profile. Also, Dr. Bennett did not know the contents of the FBI profile. The profile had been marked for identification only and had not been introduced into evidence.
Defense counsel's examination of Dr. Bennett was as follows:
Q All right. Now, you also said that most anyone could inflict this type wound if they used that drill rifle right there?
A I don't think I said that. I said that it wouldn't surprise me that, and I think it was a young girl or something was the example used by the prosecution, and that's perfectly consistent. I'm playing devil's advocate, my three-year-old couldn't do it probably.
Q Okay. And that's assuming the rifle is the weapon, that the rifle is the weapon?
A That's correct.
Q That's a pretty big assumption, isn't it?
A Well, I'm relying largely on the blood found on the weapon and compared to the serology evidence from the crime lab which, if it hasn't been discussed already, may be brought up later. But, it's reasonable for an instrument like that.
Q It's reasonable that that instrument could have inflicted those wounds?
A Yes sir.
Q But, it's just as reasonable that other instruments could have, too, caused those wounds? And it's just as reasonable that a young man with a good upper *330 body strength could have caused those wounds?
A Those are possibilities.
Q Okay. Now, you wouldn't contradict the FBI, would you?
BY MR. BOWEN: I object to that, Your Honor.
BY THE COURT: The objection will be sustained.
BY MR. CHATHAM: Your Honor, could I know for the record the basis for the objection?
BY THE COURT: Counselor, we don't compare. There is no testimony here at all about the FBI anywhere to compare with the testimony of the Bureau.
BY MR. CHATHAM: I'm not going to be allowed to cross examine this witness on that?
BY THE COURT: Yes sir, you can cross examine the witness.
BY MR. CHATHAM: I mean, on that particular point?
BY THE COURT: I doubt if he knows anything about the FBI report, first, counselor.
Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Miss.R.Evid. 801(c). The FBI profile clearly falls within the definition of hearsay. It was a statement made out-of-court. Defense counsel never introduced it into evidence as a public record or report of a public agency pursuant to Mississippi Rules of Evidence 803(8). And defense counsel was offering the document to prove that the injuries to Pannell could only be inflicted by someone with great upper body such as a young man and could not have been inflicted by Alexander. In Gullett v. State, 523 So.2d 296 (Miss. 1988), when letters written by the brother of a defendant to their mother were admitted and the brother was not called to testify, this Court explained:
Statements other than those made by the declarant while testifying made out of court by another and offered in evidence to prove the truth of the matter asserted constitute inadmissible hearsay. [footnote omitted] Gates v. State, 484 So.2d 1002, 1007-08 (Miss. 1986); Fuselier v. State, 468 So.2d 45, 52 (Miss. 1985); Lee v. State, 338 So.2d 395, 397 (Miss. 1976); Ellis & Williams Mississippi Evidence § 8-1 (1983); cf. Rule 801, Miss. R.Ev. Such out of court statements can be made orally or in the form of a writing, as is the case here.
Gullett, 523 So.2d at 299.
The FBI profile was properly excluded as inadmissible in the case at bar just as the letter in Gullett was inadmissible. Both were written forms of hearsay offered into evidence to prove the truth of the matter asserted.
Defense counsel could have called the proper witness to offer the profile into evidence but did not. The profile was never proffered as evidence. Therefore, Dr. Bennett could not be examined as to its contents.
The trial judge properly excluded the FBI profile in the case sub judice. It was within the trial judge's wide discretion to control the cross examination as described in Sayles, 552 So.2d at 1387.

V.

THE TRIAL COURT DID NOT ERR IN RESTRICTING THE DEFENSE'S CROSS-EXAMINATION OF STEVE RHOADS CONCERNING A NEWSPAPER ARTICLE ABOUT RHOADS' INVOLVEMENT IN THE CASE.
At trial, defense counsel wanted to examine Rhoads about statements which he had allegedly made to a reporter and published in newspaper articles which would have shown that he had possibly made contradictory statements concerning his interrogation of Alexander. The State had previously brought to the attention of the court by way of a motion in limine that this was a likely line of questioning. The State had made an objection in the motion in limine, and the judge had not yet ruled when Rhoads was put on the witness stand. During questioning of Rhoads, the judge ruled that the veracity of Rhoads could not be challenged in this manner. Alexander again claims that her fundamental right to confront a witness was violated.
*331 The State claims that the January 20, 1987, Chicago Tribune article written by Jim Spencer was hearsay because the reporter was not present to testify. Defense counsel attempted to use the article to impeach the testimony of Rhoads by showing that Rhoads had said during his interview with Alexander, "Damn it, Stephanie, you are making this up, I want the truth." The newspaper article based on an interview with Rhoads reports Rhoads made the statement. Rhoads denied at the suppression hearing ever making the statement and said the article was not accurate.
At trial, Judge Gardner explained his ruling:
Simply stated, I guess, I believe it is within common knowledge that newspaper and other publications are hearsay. If the person who wrote that article were available to testify or if the truthfulness or the fact of that statement could somehow be tested, it might very well be that the evidence would be admissible; however, if I understand what you have told me, you do not propose to introduce the writer of any of those articles. I would observe that frequently newspaper or magazine and other publications are inaccurate and for that reason, it is the opinion of the court that you not be permitted to use those articles to test the veracity of this witness.
Pursuant to Gullett, 523 So.2d at 299, the newspaper article is inadmissible hearsay because the author was not present and the trial judge was correct to exclude it. As in Gullett, the newspaper article is a written statement by a declarant not before the court. The trial judge was within his discretion to control the cross examination of Rhoads. See Sayles, 552 So.2d at 1387. There is no error in this issue of appeal.

VI.

THE TRIAL COURT'S FAILURE TO DECLARE DR. J.E. MORRIS AS A HOSTILE WITNESS WAS HARMLESS ERROR.
The trial judge did not declare Dr. Morris, the school psychologist, to be a hostile witness when he was called by defense counsel. Alexander claims that Dr. Morris was closely aligned to the prosecution of the case, fit all parameters of the definition of hostile witness, and should have been treated as an adverse witness under Rule 611 of the Mississippi Rules of Evidence. Defense counsel wanted to ask leading questions of Dr. Morris. Alexander argues that she was prejudiced by the judge's failure to label Dr. Morris as hostile because defense counsel could not effectively present the needed testimony from Dr. Morris.
The State claims that there was no proffer made as to what additional information might have been introduced into evidence had Alexander been allowed to call Dr. Morris as an adverse witness and that Alexander was not harmed by not being allowed to use leading questions with Dr. Morris.
Rule 611(c) of the Mississippi Rules of Evidence provides, "When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." As a general rule, leading questions should not be used on direct examination since they suggest the answers the attorney wants from his own witness. This gives unfair advantage to the party who is presenting his case. However, the judge has discretion in allowing leading questions. A party has the right of cross examination when questioning witnesses who are hostile or when questioning an adverse party or someone identified with an adverse party. Comment, Miss.R.Evid. 611(c).
The issue of who may be considered as identified with an adverse party was confronted in Harris v. Buxton T.V., Inc., 460 So.2d 828 (Miss. 1984). In Harris, this Court found error where the trial court refused the plaintiff's request to call as an adverse witness and ask leading questions of the defendant's building contractor. This Court reversed because the trial judge failed in his responsibility to determine from the facts and circumstances of the case whether the witness proposed to be called was one who was identified with the *332 adverse party within the meaning and contemplation of the rule. The Harris trial judge had made no such inquiry. Id. at 833.
According to Harris, the following test was set forth for determining how closely the witness must be identified with the adverse party in order to be considered hostile:
(1) If the witness' acts or omissions are the predicate for a party's claim or defense, ..., then that witness is ordinarily sufficiently identified with an adverse party and may be called as an adverse witness and interrogated by leading questions.
(2) If the conduct of the witness plays such an integral part in the transaction or occurrence which is the subject of the action and which gives rise to... potential liability, ..., then again the witness is said to be sufficiently identified with the adverse party so that the witness may be called as an adverse witness and cross examined.
Harris, 460 So.2d at 833.
The Comment to Miss.R.Evid. 611 indicates that the Advisory Committee is cognizant of the Harris decision but considers the interpretation and application of "identified with the adverse party" to be broader than expressed in Harris.
In a more recent case, this Court considered what constitutes an adverse witness within the criminal context. In Hall v. State, 546 So.2d 673 (Miss. 1989), this Court found that a confidential informant called by the defendant qualified as an adverse witness and it was error to prevent the defendant from questioning the informant regarding a deal with the Government to avoid prosecution which may have indicated bias; however, the error was not reversible since the informant did not participate in the alleged sale of drugs and was not a witness in the State's case in chief, and the informant's possible motive for informing on the defendant was amply displayed to the jury. Id. at 675.
Dr. Morris was an adverse witness under Harris. Dr. Morris' acts are the predicate for Alexander's defense that she had been hypnotized. And Dr. Morris was a witness called by the State at the suppression hearing. However, as in Hall, this error is not reversible because Alexander was not prejudiced by not being "officially" allowed to lead Dr. Smith. The record indicates that defense counsel did ask leading questions of Dr. Morris anyway. For example:
Q Well, sir, it was in there about a wooden drill rifle being  suspected as being the murder weapon with blood all over it, that was in the newspaper?
A That's true.
Q It was in there about the killer probably entered through, in fact, the first story was the killer probably entered through a dormitory window because of the cut outer torn screen in the dormitory?
BY MR. BOWEN: Your Honor, we are going to object to the leading nature of these questions. He is his witness on redirect. We object to that, it's extremely leading.
BY THE COURT: The objection will be overruled.
Even though Dr. Morris may have been a hostile witness, there was no prejudice to Alexander by the failure to declare him as such. Defense counsel was still able to elicit from Dr. Morris that persons under hypnosis may have false memories, that one danger of forensic hypnosis is suggestive questions, that Dr. Morris does not have the ability to determine whether or not a person has been placed under hypnosis, that video tapes should be used when hypnosis is attempted, that a complete history should be taken before hypnosis is attempted, and that Dr. Morris has never been treated as an expert on hypnosis. The failure to declare Dr. Morris a "hostile" witness was error, but it was harmless error.

VII.

THE TRIAL COURT DID NOT ERR BY ALLOWING INTO EVIDENCE THE FACT THAT ALEXANDER WAS PREGNANT AT THE TIME SHE WAS IN JAIL.
Because the Assistant District Attorney inquired about whether Alexander's *333 stepfather knew Alexander was pregnant during the time she was in jail immediately after her incriminating statements and thus introduced to the jury the fact of an illicit relationship outside of marriage, Alexander contends that her right to a fair trial was severely hindered. Alexander argues that the prosecution's act was a tactic to gain advantage using an extraneous and collateral matter to discredit her moral character which was not at issue.
The questioning of Alexander's stepfather, David Johnson, went as follows:
Q Did you at any time during this period try to find out what Stephanie's physical condition was?
A I don't know.
Q You don't know?
A My wife may have taken her to the doctor. I don't know.
Q Didn't you, in fact, know that there was something wrong with Stephanie at this time?
A No, sir.
Q You did not?
A Like what?
Q You didn't know that she was pregnant?
A That did come out later.
Q She did not know it at this time?
A No, sir.
A You found out later, though, that she was pregnant during this period, didn't you?
BY MR. CHATHAM: Objection.
BY THE COURT: Objection overruled.
Q Just answer the question, Mr. Johnson?
A What was the question again?
Q You did find out that during this period Stephanie Alexander was pregnant, didn't you?
A Between the time she was arrested and now, yes, sir.
Defense counsel then moved for a mistrial. The court found that the emotional and physical condition of Alexander had been placed in issue by her counsel and overruled the motion for mistrial. The trial court also found that defense counsel did not object soon enough.
Alexander relies on two cases to support this assignment of error, Hughes v. State, 470 So.2d 1046 (Miss. 1985), and Smith v. State, 457 So.2d 327 (Miss. 1984). In Hughes, this Court reversed the conviction of a defendant charged with the sale of more than one ounce of marijuana when proof of an illicit relationship with a woman without the benefit of marriage was placed before the jury. The prosecutor's line of questioning in the drug case as to whether the defendant was "living with a woman" was improper. Id. at 1048.
In Smith, this Court reversed a conviction of a defendant accused of carrying a concealed weapon when the prosecutor subjected a defense witness to irrelevant, inflammatory and prejudicial evidence so as to deny the defendant his right to a fair and impartial trial. The prosecutor subjected a defense witness in Smith's trial to questions about her engagement in prostitution even though she did not have a conviction on such a charge. Id. at 335.
Both Hughes and Smith differ from the case at bar. The prosecutors in Hughes and Smith used the questioning about illicit relationships to raise doubt as to the credibility of the witness. The prosecutor in the controversy at hand used questioning about a pregnancy to illuminate Alexander's condition when she confessed to killing Pannell. The emotional and physical condition of Alexander was an issue of her defense. In fact, the gravamen of Alexander's entire defense was her physical and emotional status at the time of the confessions. Any medical condition that may have influenced Alexander at the time of the confessions was relevant.
Furthermore, pregnancy in of itself does not cast aspersions on a woman's character. Alexander's marital status was never placed in the record.

*334 VIII.

THE TRIAL COURT DID NOT ERR BY DISALLOWING A DEMONSTRATION IN THE COURTROOM BY WITNESS DR. STANLEY OF HOW EASILY THE DEFENDANT COULD BE HYPNOTIZED, ESPECIALLY IN LIGHT OF THE FACT THAT THE TRIAL COURT DID ALLOW A VIDEOTAPE OF A HYPNOSIS OF ALEXANDER. THE TRIAL COURT'S EXCLUSION OF CERTAIN TESTIMONY OF WITNESS DR. STANLEY REGARDING HIS PERSONAL OPINION ABOUT THE CASE WAS HARMLESS ERROR.
Alexander disputes the trial judge's decision to disallow her psychologist, Dr. Stanley, from testifying as to his opinions concerning Alexander's inability to be a competent witness on her own behalf and her inability to distinguish between fact and fantasy, both inabilities due to the effects of hypnosis. Dr. Stanley was also prohibited from giving an in-court demonstration of Alexander's susceptibility to hypnosis. Alexander claims that the testimony goes to the gravamen of her defense and that Dr. Stanley should have been allowed to give his opinion because Rule 704 of the Mississippi Rules of Evidence allows opinions on ultimate issues. Alexander also claims that the demonstration was probative and spoke to a pivotal issue in the case, Alexander's susceptibility to hypnosis.
The State contends that the pivotal issue was not whether Alexander could be hypnotized but whether she had been hypnotized at the time of her incriminating statements and letter. The State also argues that Dr. Stanley did give his personal opinion about the case when he stated that Alexander had been unknowingly hypnotized by Dr. Morris or Rhoads and had not been properly dehypnotized which left her in a highly suggestible frame of mind.
The Mississippi Rules of Evidence provide:
RULE 704. OPINION ON ULTIMATE ISSUE
Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
Rule 704 does not result in the admission of all opinions. It is an absolute requirement under Rules 701 and 702 that opinions must be helpful to a determination of the case before they are admissible. Furthermore, under Rule 403, evidence is excluded which wastes time. A question may not be asked which is based on inadequately explored legal criteria since the answer would not be helpful. See Comment, Miss. R.Evid. 703.
There is a difference between questions of opinion of guilt of a defendant and questions of opinion on other possible matters of ultimate fact. See United States v. Masson, 582 F.2d 961 (5th Cir.1978).
Questions which simply allow the witness to tell the jury what result to reach are impermissible, as are questions asking the witness for a legal conclusion. Dale v. Bridges, 507 So.2d 375, 378 (Miss. 1987) (citing Matthews v. Ashland Chemical, Inc., 770 F.2d 1303, 1311 (5th Cir.1985) and Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir.1983)).
The questions asked of Dr. Stanley as to his opinion regarding whether Alexander was suffering the effects of hypnosis called for an opinion as to an ultimate issue permissible under Rule 704. Dr. Stanley was not asked for his opinion as to whether Alexander was guilty or whether Alexander had voluntarily confessed. Dr. Stanley's opinion about prior hypnosis did not tell the jury what result to reach or provide a legal conclusion. His opinion was admissible.
The introduction of experiments or tests at trial are in the discretion of the trial judge. Experiments are viewed with caution because of the high risk of obtaining unreliable evidence. Hines v. State, 339 So.2d 56, 57 (Miss. 1976). Since hypnosis on Alexander would have been a *335 test or experimentation, it was properly viewed with caution by Judge Gardner. Judge Gardner was within his discretion to exclude the demonstration.
In sum, the trial judge was correct to exclude the demonstration but incorrect to exclude Dr. Stanley's opinion.
Even though the exclusion of Dr. Stanley's personal opinion was error, the error was harmless because it did not result in prejudice to Alexander's case. Dr. Stanley was able to state that he thought Dr. Morris or Rhoads had hypnotized Alexander; Dr. Stanley told the jury he thought a miscarriage of justice had occurred; and Judge Gardner did allow the defense to show a video tape of Alexander being hypnotized by Dr. Stanley.

IX.

THE TRIAL COURT DID NOT ERR IN PROHIBITING ALEXANDER FROM CALLING DR. GALVEZ, WHO WAS NOT ON THE WITNESS LIST SUPPLIED TO THE STATE, AS A WITNESS TO TESTIFY ABOUT WHETHER THE DRILL RIFLE WAS THE MURDER WEAPON AND ABOUT SEMINAL FLUID FOUND IN THE VICTIM.
Alexander maintains that her request to call Dr. R. Galvez should have been granted. Alexander wanted to delay the trial in order to present the testimony of Dr. Galvez to establish his opinions that the drill rifle was not the murder weapon and that possibly recent seminal fluid was present. Alexander argues that the trial judge's denial was improper and greatly prejudiced her.
The State argues that defense counsel had already presented opinion testimony through private investigator, A.W. Mooney, that the drill rifle was not the murder weapon and that a young girl would not have enough strength to inflict the fatal blows. Likewise, Dr. Guild had already testified that there was an indication of the presence of seminal fluid. The State contends that Dr. Galvez's testimony would have been merely cumulative.
The State also argues that Alexander did not follow discovery rules and was prohibited from calling Dr. Galvez because his name was not furnished to the State and he had not been subpoenaed.
When Alexander requested a delay in order to call Dr. Galvez, the court found:
BY THE COURT: The witness that the Defendant proposes to call is not under subpoena and is not available to testify in this court until Saturday of this week. In accord with the discovery rules adopted by the Supreme Court of this State, that name was not furnished and on those grounds alone this Court would certainly be within proper bounds denying the request of the Defendant to continue the case until Saturday so that Galvez can testify and I do so rule, with this observation, Counselor, the matter of the acid phosphatase is that there is proof ... to be one hundred percent sure, you must find the presence of spermatozoa which he did not find; therefore, he said only that it indicated the presence of seminal fluid. Dr. Guild, presented by the Defendant in this case, when questioned about this matter, indicated that it was a positive test for and without question indicated the presence of seminal fluid. That proof is before the Court. Any further proof in that regard would seem to be repeating the same circumstance. It is the opinion of the Court that it would be a waste of time to delay the trial of this case to have Galvez [sic] appear.
Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice provides:
.....
(c) If the defendant requests discovery under this rule [as Alexander requested in the cause at bar], the defendant shall, subject to constitutional limitations, promptly disclose to the prosecution and permit it to inspect, copy, test, and photograph, the following information and material which corresponds to that which the defendant sought and which is in the possession, custody, or control of the defendant or his or her counsel, or the *336 existence of which is known, or by the exercise of due diligence may become known, to the defendant or his or her counsel:
(1) Names and addresses of all witnesses in chief proposed to be offered by the defendant at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved, of each such witness, and the substance of any oral statement made by any such witness;
.....
(i) If at any time prior to trial it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule, request, or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances.
If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
(1) Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
(2) If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court should, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
(3) The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

The court shall follow the same procedure for violation of discovery by the defense. (emphasis added)
Discovery Rule 4.06 and case law pertaining to discovery violations by the State also govern discovery violations by the defense. This Court's decision in Darghty v. State, 530 So.2d 27 (Miss. 1988), explained that even-handed application of Rule 4.06 requires the same procedure to be followed when the State objects to testimony because of a defendant's violation as when the defendant objects for the same reason. Id. at 33.
In Houston v. State, 531 So.2d 598 (Miss. 1988), this Court found that a lower court's exclusion of a substantial portion of a defendant's evidence through its witnesses due to a discovery violation should rarely be used. The Houston lower court erred in excluding defense witnesses in the defendant's trial on ground that witnesses were not disclosed by a discovery deadline date, as the court did not provide prosecution reasonable opportunity to become familiar with the undisclosed evidence, and prosecution did not request a continuance. Id. at 612.
Darghty and Houston are unlike the case at bar because the excluded witnesses were on hand in Darghty and Houston to furnish testimony or be interviewed by the State for familiarization. In the controversy at hand, Dr. Galvez was not available to be interviewed by the State.
In Box v. State, 437 So.2d 19, 21 (Miss. 1983), this Court stated:
Under the facts of this case we believe that reversal is warranted. Although we are not hide-bound to reverse every case in which there was some failure... to abide by a discovery rule, this case should be reversed and remanded for new trial. Prosecuting attorneys, as well as defense attorneys, must recognize the obligation to abide by discovery rules. A rule which is not enforced is no rule.
Justice Robertson's concurring opinion to Box v. State, 437 So.2d 19 (Miss. 1983), enumerated guidelines for evaluating discovery violations under Rule 4.06 of the U.Crim.R.Cir.Ct.Prac. In the recent decision of Traylor v. State, 582 So.2d 1003 (1991), this Court adopted and again enumerated those guidelines as follows:

*337 1. Upon defense [or State] objection, the trial court should give the defendant [or prosecution] a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.
2. If, after this opportunity for familiarization, the defendant [or State] believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.
3. If the defendant [or State] does request a continuance the State [or defendant] may choose to proceed with trial and forego using the undisclosed evidence. If the State [or defendant] is not willing to proceed without the evidence, the trial court must grant the requested continuance.
Traylor, 582 So.2d at 1006.
In Box, Justice Robertson particularly noted, "Discovery under Rule 4.06 is a two-way street. When the defendant withholds discoverable evidence which, under Rule 4.06, he was required to produce, I would urge that these same guidelines be made applicable." See Box, 437 So.2d at 25, footnote 3. Our concern is with fairness, with avoiding unfair surprise to either the state or the defense. Where the evidence is otherwise admissible, with otherwise competent witnesses, where the sole objection is a failure to disclose in response to a discovery request, then the defect should be cured if possible and the evidence should be admitted and the case should proceed. Id. at 24. The guidelines would realistically and effectively tell the parties that their obligation to conform to discovery orders must be taken seriously. Id. at 25.
The Box-Traylor provisions have become the guidelines followed by this Court when discovery violations by either party are assigned as error on appeal, and the guidelines are strictly enforced against both the prosecution and defense counsel. See Jenkins v. State, 607 So.2d 1171 (1992). This Court has continually balanced Rule 4.06 violations with the resulting prejudice to the defendant. Moore v. State, 508 So.2d 666, 668 (Miss. 1987). While the guidelines of Rule 4.06 and Box-Traylor should be followed in a case such as the one at hand where the defense has violated discovery and offers undisclosed testimony, the guidelines could not have been met in the case sub judice due to the failures of the defense counsel. Defense counsel did not have Dr. Galvez at the courtroom ready to proffer testimony. The State could not be given the opportunity to become familiar with Dr. Galvez and decide whether to request a continuance. An opportunity for familiarization could not be granted because of the omission by defense counsel. The trial judge could not offer the State an opportunity of familiarization. It may not have been defense counsel's fault that Dr. Galvez was testifying at another trial, but if defense had followed discovery rules and had provided information to the court and the State earlier that Dr. Galvez was needed as a witness and a subpoena issued, Alexander's trial date would have been set accordingly.
Alexander was not prejudiced by the exclusion of Dr. Galvez's testimony. Defense counsel was able to produce testimony of a witness who stated that the drill rifle was not the murder weapon and that a young girl could not have inflicted the blows Pannell received. Defense also presented testimony that there was an indication of seminal fluid.
Because it is defense counsel's omission that prohibited the Box-Traylor guidelines from being followed, because Box recognizes the obligation to strictly follow rules and defense counsel at bar did not, and because Alexander was not prejudiced by the exclusion of Dr. Galvez's testimony, this assignment of error is without merit.

X.

THE TRIAL COURT DID NOT ERR IN ALLOWING A GRUESOME AUTOPSY PHOTOGRAPH OF THE VICTIM'S OPENED SKULL TO BE ADMITTED INTO EVIDENCE.
Alexander contends that the introduction over objection of an autopsy photograph is reversible error because the picture had no probative value but served only to inflame the jury. The picture depicted *338 the opened skull of Pannell during the autopsy, an opening created during the autopsy and not during the assault. The picture was allowed into evidence to establish the cause of death. Alexander claims that since the death of Pannell was not denied, the photograph should not have been introduced.
As a general rule, the admissibility of photographic evidence rests within the sound discretion of the trial judge. The trial judge's decision will be upheld on appeal unless abuse of discretion can be shown. Ladner v. State, 584 So.2d 743, 753-754 (Miss. 1991); Mackbee v. State, 575 So.2d 16, 31 (Miss. 1990). "[P]hotographs of bodies may be admitted into evidence where they have probative value, and where they are not so gruesome as to be overly prejudicial and inflammatory." Stringer v. State, 500 So.2d 928, 934 (Miss. 1986).
In Williams v. State, 544 So.2d 782 (Miss. 1987), this Court reviewed the admission of photographs showing the wounds of the victim as well as portions of the victim's autopsy. In determining that the trial court had correctly admitted the photographs into evidence, the court reviewed the broad discretion given to the trial judge. The court stated:
We have repeatedly admitted photographs of every description with the explanation that some "probative value" is present... .
A review of our case law indicates that the discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and extenuation of probative value. At this point in the development of our case law, no meaningful limits exist in these so-called balance of probative/prejudicial effect of photographs test.
Williams, 544 So.2d at 785. (citations omitted)
In contrast to the almost limitless discretion of Williams is the recent decision of this Court in McNeal v. State, 551 So.2d 151 (Miss. 1989), the only decision thus far by this Court finding that a trial court abused its discretion in admission of a gruesome photograph. In McNeal, the court unequivocally found that the admission of photographs depicting the victim's "decomposed, maggot-infested" skull was an abuse of discretion and reversible error. The court stated:
We find that exhibits 5, 13, and 15 are gruesome and lack any evidentiary purpose. Although the state argues that these photographs are relevant in proving the corpus delicti, we believe that the probative value of the photographs is outweighed by their tendency to inflame and prejudice the jury... . By virtue of the authority set out in McFee [v. State, 511 So.2d 130] [(Miss. 1987)] and Rule 403, M.R.E., this Court holds that the trial court abused its discretion and was in error in allowing the introduction of these photographs into evidence.
McNeal, 551 So.2d at 159. (citations omitted)
In today's case, the photographs admitted into evidence recorded the cause of death of Pannell. While the opened skull is indeed graphic, it is not overly gruesome or inflammatory. The picture of the bruising on the victim's brain does not show additional, irrelevant, repulsive damage inflicted upon the body following a killing and before discovery by the authorities as in McNeal. The photograph establishes the cause of death as a severe beating about the head, temple and ear with a blunt instrument and depicts bruising to the brain. While Alexander does not deny the death of Pannell, the cause of death was part of the State's case-in-chief. Judge Gardner viewed the photographs outside the presence of the jury and overruled some of the objections after viewing the photographs for their relevance and probative value. The trial judge was within his discretion in determining that the probative value of the photograph outweighed any prejudice to Alexander.

XI.

THE PROSECUTOR DID NOT COMMENT DURING CLOSING ARGUMENT ON ALEXANDER'S RIGHT TO REMAIN SILENT.
Alexander contends that the District Attorney's closing argument to the *339 jury improperly commented on Alexander's right to remain silent and not to testify. The District Attorney stated:
I wish we had a video of Room 110 and Room 112 the night this murder occurred. I believe if we did, we would see Stephanie Alexander going in there and killing Stacey Pannell. But, we don't have those in criminal cases, ladies and gentlemen. We can't put before you exactly what happened in there. I submit to you that the only people who know what happened in there is Stephanie Alexander and God. The other person that was in the room can't talk, she's dead.
The State first argues that Alexander is procedurally barred from claiming that the prosecutor commented on the defendant's failure to testify because no contemporaneous objection was ever made. However, this Court may reverse even without a timely objection when the prosecuting attorney has commented upon the defendant's right not to testify. Griffin v. State, 557 So.2d 542, 552 (Miss. 1990) (citing Livingston v. State, 525 So.2d 1300, 1306 (Miss. 1988)); Griffin v. State, 504 So.2d 186, 193 (Miss. 1987); Stringer v. State, 500 So.2d 928, 940 (Miss. 1986); West v. State, 485 So.2d 681, 688 (Miss. 1985).
The State then argues that this comment referred to Alexander's lack of defense and does not comment on Alexander's failure to testify. The State submits that the comment was a legitimate remark on the evidence before the jury which was invited by the questions raised by the defense's closing argument. The State argues that defense counsel raised the question in closing argument of what the killer did about the copious quantities of blood that must have been on the rifle, towel, and the person of the killer and that the District Attorney was merely answering the question saying no one knew except Alexander, Pannell, and God.
The right of a defendant to remain silent is a federal and state constitutional requirement. In all criminal prosecutions the accused shall ... not be compelled to give evidence against himself. Miss.Const.Art. 3, Sec. 25. No person ... shall be compelled in any criminal case to be a witness against himself. U.S. Const.Am. 5.
Alexander relies on Harwell v. State, 129 Miss. 858, 93 So. 366 (1922), which held that reversible error exists when a prosecutor comments on the right of the defendant not to testify, and on Griffin, 557 So.2d 542, wherein this Court said:
This constitutional right has been violated, not only when a direct statement is made by the prosecution as to the defendant's not testifying, but also by a comment which could reasonably be construed by a jury as a comment on the defendant's failure to testify. Jimpson v. State, 532 So.2d 985, 991 (Miss. 1988); Livingston v. State, 525 So.2d 1300, 1305-1308 (Miss. 1988); Monroe v. State, 515 So.2d 860, 865 (Miss. 1987); Bridgeforth v. State, 498 So.2d 796 (Miss. 1986); Wilson v. State, 433 So.2d 1142, 1146 (Miss. 1983); Davis v. State, 406 So.2d 795, 801 (Miss. 1981).
Griffin, 557 So.2d at 552. In Griffin, this Court reversed the conviction of a defendant in a capital murder trial where an assistant prosecutor remarked during closing argument to the jury that "[T]hey tell you, there's one man alive today who can tell you what happened, and I agree with that. There is one person who could tell you what happened and we have  we have a statement  we have a statement from him. We have a confession, an oral confession, we have a written confession, yes, we do." This Court found that the remark directed the jury's attention to the failure of the defendant to take the stand and admit or deny the contents of the confession and was a direct remark commenting on the defendant's exercise of his constitutional guarantee. Id.
The State relies on Shook v. State, 552 So.2d 841 (Miss. 1989), which held:
As recognized in Jimpson [v. State, 532 So.2d 985, 991 (Miss. 1988)], not every comment regarding the lack of any defense or upon the defense presented is equivalent to a comment on the defendant's failure to testify. Id. Attorneys are to be given wide latitude in making their closing arguments. Id. (citing *340 Johnson v. State, 477 So.2d 196, 209 (Miss. 1985)). Moreover, the State is entitled to comment on the lack of any defense, and such comment will not be construed as a reference to a defendant's failure to testify "by innuendo and insinuation." Id. (citing Wilson v. State, 433 So.2d 1142, 1146 (Miss. 1983))
Shook, 552 So.2d at 851.
In the case at bar, the District Attorney remarked that Pannell cannot talk because she is dead. His comment does not refer to Alexander's silence. He does mention that only Alexander and God know what happened in Pannell's room, but he does not observe Alexander's silence during trial. His comment refers to the defense presented and is within the wide latitude of closing arguments. The observation of District Attorney would be a reference to Alexander's failure to testify only if innuendo and insinuation were employed.

XII.
The conviction by a jury in the trial below is affirmed. The lower court found, within its discretion as a fact-finder, that Alexander was not hypnotized at the time of the incriminating statements. We find no error in the additional issue of appeal assigned by Alexander on appeal. We affirm the conviction of Alexander.
Finally, we note that this sad episode in our state's history has deeply troubled this Court. The image of a society where a young girl turns readily to deadly violence in order to resolve a disagreement with a girlfriend is dismal and sobering.
CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN and BANKS, JJ., concur.
McRAE, J., concurs in result only.
NOTES
[1] According to a newspaper article, which is not part of the record but is contained in the clerk's papers attached to one of Alexander's motions, there were two suspects. They were a man with a history of sex offenses in the area and Pannell's boyfriend who believed she had been unfaithful to him on her trips home from college. There was not enough evidence to charge anyone. See Spencer, Chicago Tribune, January 20, 1987.