721 So.2d 650 (1998)
Demarcus JOHNSON a/k/a Sonny Jake Johnson, Appellant,
v.
STATE of Mississippi, Appellee.
No. 96-KA-01174COA.
Court of Appeals of Mississippi.
August 4, 1998.
*652 Edward Dudley Lancaster, Houston, Appellant.
Michael C. Moore, Attorney General, Jean Smith Vaughan, Special Asst. Atty. Gen., for Appellee.
Before THOMAS, P.J., and DIAZ and HERRING, JJ.
HERRING, Judge, for the Court:
¶ 1. Demarcus Johnson appeals his conviction in the Chickasaw County Circuit Court for aggravated assault. The trial court sentenced Johnson to serve fifteen years in the custody of the Mississippi Department of Corrections with five years suspended pending his good behavior and to pay the sum of $213 within six months from his release from prison. We reverse and remand for a new trial.

I. THE FACTS
¶ 2. Joseph Pratt, a seventeen-year-old resident of Houston, Mississippi, was at Quin's Pool Hall on the evening of December 26, 1996. While inside the pool hall, Pratt and Demarcus Johnson, who was sixteen years old at that time, exchanged words, and they started to fight. According to Pratt, Lavarus Yates handed Johnson a pistol. Johnson put the gun to Pratt's head and said "You got [to] believe I'll blow your, ___,___ brains out of your head." Pratt stated that he pushed Johnson against a pool table, but then Lavarus Yates hit him with a pool stick, causing Pratt to fall to the floor. Pratt testified that as he attempted to flee, Johnson shot him in the leg. Thereafter, Pratt proceeded to run out of the pool hall along with numerous others. Outside the pool hall, Johnson fired his pistol several more times and shot Pratt in the back. Pratt was able reach a nearby gas station before passing out, and was ultimately taken to a local hospital for treatment. At trial, Pratt testified that the first shot fired by Johnson went through his leg, and although there was a bullet lodged in his spine, he is "okay." Following the shooting, Pratt was hospitalized for three days.
¶ 3. Chris Harris testified for the prosecution, and he was at the pool hall on the evening in question. According to Harris, Johnson started the altercation with Pratt when he "called Pratt a lie." Harris testified that as Pratt attempted to leave the pool hall, Johnson shot him in the leg. Further, Harris stated that he saw Johnson fire at Pratt a second time while outside the pool hall. After the shootings, Harris located Pratt at a *653 nearby gas station and took him to the hospital for treatment.
¶ 4. William Pickens also testified for the State. Pickens, a friend of Joseph Pratt, was also at the pool hall on the night Pratt was shot. Pickens testified that he saw Johnson and Pratt get into an argument, and he saw Lavarus Yates give Johnson a gun. Pickens also saw Johnson put the gun in Pratt's face. According to Pickens, Pratt hit Johnson, and the gun fell to the floor. Thereafter, Johnson retrieved the gun, shot Pratt in the leg, and also shot him in the back outside the pool hall.
¶ 5. Johnson's version of the facts in this case are different from the prosecution's version. Johnson testified in his own defense and stated that on the night in question, he found a pistol on the ground behind the pool hall. Johnson picked up the gun and put it in his pocket. Thereafter, Pratt approached Johnson and asked Johnson where he was from. Johnson informed Pratt that he was from Mantee, and Pratt told him that persons from Mantee were not allowed in the pool hall. According to Johnson, Pratt lifted a bar stool above his head as if he was going to use it to strike Johnson. However, he then put the stool down without incident. Johnson also testified that at some point, he saw Pratt put his hand in his pocket. In response, Johnson took the pistol from his own pocket in order to scare Pratt. However, he did not aim nor intentionally fire the weapon at Pratt. Instead, Johnson stated that as he and Pratt fought over the gun; it discharged during the melee. According to Johnson, after the gun discharged, it dropped to the floor, and he ran out of the building. He has no idea who shot Pratt in the back.
¶ 6. Torean Cooperwood testified for Johnson and substantially corroborated Johnson's version of the facts. Cooperwood stated that after Johnson pulled out his weapon, the two fought over the gun, and it discharged while they were fighting. According to Cooperwood, the gun dropped to the floor, and Pratt and Johnson ran out of the pool hall. As he followed them, Cooperwood heard someone say "William, shoot him William, shoot." Cooperwood then heard another gun shot. He did not, however, know who "William" was or who actually shot Joseph Pratt outside the pool hall.
¶ 7. Prior to trial, Johnson moved the trial court to suppress Johnson's written statement which was given to police officers on January 3, 1996. Ultimately, the trial court ruled that the statement was admissible and allowed the State to enter the statement into evidence at trial.
¶ 8. Johnson was convicted of aggravated assault and sentenced by the trial court. He now appeals to this Court.

II. THE ISSUES
¶ 9. On appeal, Johnson raises the following issues as stated verbatim in his brief:

I. THE TRIAL COURT WAS INCORRECT IN REFUSING TO GRANT THE APPELLANT'S LESSER INCLUDED INSTRUCTION?

II. THE STATE PROVIDED INSUFFICIENT REASONS FOR STRIKING BLACK JURORS DURING THE SELECTION OF JURORS.
III. THE LOWER COURT SHOULD HAVE GRANTED THE DEFENDANT'S REQUEST FOR A NEW TRIAL DUE TO THE USE OF AN INVOLUNTARY CONFESSION.

III. THE ANALYSIS

I. DID THE TRIAL COURT ERR IN REFUSING TO GRANT THE APPELLANT'S LESSER INCLUDED INSTRUCTION.
¶ 10. Johnson argues that the trial court committed error in refusing to grant a lesser-included offense instruction which would have allowed the jury to have found the Appellant guilty of simple assault. "It is well-established in this state that before a lesser-included offense instruction is given it must be warranted by the evidence." Stevens v. State, 458 So.2d 726, 731 (Miss.1984) (citations omitted). "A lesser-included offense instruction is warranted where the jury could find, from the evidence presented, the defendant not guilty of the crime with which he was charged, yet guilty of the lesser included *654 offense." Green v. State, 631 So.2d 167, 173 (Miss.1994) (citing Toliver v. State, 600 So.2d 186, 192 (Miss.1992)). "In sum, a lesser included offense instruction must be granted where a reasonable juror could not on the evidence exclude the lesser-included offense beyond a reasonable doubt." Holland v. State, 587 So.2d 848, 870 (Miss.1991) (citing Boyd v. State, 557 So.2d 1178, 1182 (Miss.1989)); see also Fairchild v. State, 459 So.2d 793, 800 (Miss.1984) ("only where the evidence could only justify a conviction of the principal charge should a lesser included offense instruction be refused") (citation omitted). "Put another way, the test is whether `there was sufficient evidence in the record so that a reasonable juror could have concluded that the accused was guilty of simple assault, as that offense is defined in Miss. Code Ann § 97-3-7(1).' ... So the question becomes could the testimony and other evidence bring the case within the statutory definition of simple assault." Robinson v. State, 571 So.2d 275, 276 (Miss.1990).
¶ 11. Johnson was charged and indicted of aggravated assault under section 97-3-7(2) of the Mississippi Code of 1972, as amended. A person is guilty of aggravated assault if he:
attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; and, upon conviction, he shall be punished by imprisonment in the county jail for not more than one (1) year or in the penitentiary for not more than twenty (20) years.
Miss.Code Ann. § 97-3-7(2)(B) (Rev.1994).
¶ 12. Johnson argues that he was entitled to a lesser-included-offense instruction informing the jury that if they find that the State failed to prove any one or more elements of the crime of aggravated assault that the jury could proceed to determine whether or not the Appellant was guilty of the crime of simple assault under section 97-3-7(1) of the Mississippi Code, as amended, which states:
A person is guilty of simple assault if he (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (b) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or (c) attempts by physical menace to put another in fear of imminent serious bodily harm; and, upon conviction, he shall be punished by a fine of not more than Five Hundred Dollars ($500.00) or by imprisonment in the county jail for not more than six (6) months, or both.
¶ 13. The testimony in this case establishes that Johnson introduced a deadly weapon into the confrontation between the two combatants. Thus, sub-section (b) of the simple assault statute is the only portion of the statute which Johnson could use to argue that he was guilty of simple assault rather than aggravated assault.
¶ 14. The trial court in this case ruled that evidence presented at trial did not support a simple assault instruction. In addition, the trial court stated that based upon the evidence, the jury could either find Johnson guilty of aggravated assault or not guilty, based upon a self-defense theory. We agree with the trial court that there was insufficient evidence for reasonable jurors to conclude that Johnson "negligently" caused the injuries to Joseph Pratt.
¶ 15. Even when considering the evidence adduced at trial in a light most favorable to Johnson, a jury composed of reasonable minded persons could not have concluded that Johnson's act of introducing a deadly weapon into the altercation between the two combatants, pointing the gun in Pratt's face and engaging in a fight that led to the discharge of that weapon was negligent conduct. In Nelson v. State, 361 So.2d 343, 344 (Miss. 1978), the defendant, an eighteen-year-old, got into an argument with the victim after the victim stepped on the defendant's toe. One invited the other outside. After a shoving match ensued, the defendant pulled out a pistol and shot the victim in his shoulder. At trial, the defendant claimed that the pistol accidentally discharged and that he only intended to use the weapon to ward off the victim. The defendant argued that he was only guilty of simple negligence rather than aggravated assault. Id. In refusing to reverse the case, the Mississippi Supreme Court stated, "Regardless of what [the] defendant *655 intended when he pulled the pistol and pointed it at [the victim], his act of pointing a loaded pistol ... manifested an extreme indifference to the value of human life and clearly brings the act of [the] defendant within the statutory crime of aggravated assault." Id. at 345.
¶ 16. Johnson's act of introducing a deadly weapon into the altercation in this case cannot be characterized as mere negligence but instead must be characterized as exhibiting an extreme manifestation of indifference for human life. Accordingly, we affirm the trial court's ruling that a lesser-included instruction on simple assault was not warranted by the evidence.

II. DID THE STATE PROVIDE INSUFFICIENT REASONS FOR STRIKING BLACK JURORS DURING THE SELECTION OF JURORS?
¶ 17. Johnson contends that the trial court erred when it ruled that he failed to establish a pattern of discrimination by the State in the jury selection process. On review of a Batson issue, we are mindful that:
a reviewing court should give the trial court "great deference." "Great deference" has been defined in the Batson context as insulating from appellate reversal any trial findings which are not clearly erroneous.
[A] trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence. This perspective is wholly consistent with our unflagging support of the trial court as the proper forum for resolution of factual controversies.
Lockett v. State, 517 So.2d 1346, 1349-50 (Miss.1987). According to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny, once the appellant establishes a prima facie case of purposeful discrimination in the selection of jurors, the State is required to provide race-neutral explanations for challenging black jurors. Id. at 97, 106 S.Ct. 1712. To establish a prima facie case of purposeful discrimination, a defendant is required to show "(1) he is a member of a cognizable racial group; and (2) that the prosecutor exercised peremptory challenges to excuse a venire person of the defendant's race; and (3) that there is an inference that the venire persons were excluded on account of their race." Mack v. State, 650 So.2d 1289, 1296 (Miss.1994); Batson, 476 U.S. at 96, 106 S.Ct. 1712. In the case sub judice, the trial court ruled that the Appellant did not establish a prima facie case of purposeful discrimination, and therefore, the trial court did not require the State to articulate race-neutral reasons for its peremptory challenges.
¶ 18. The first element required to establish a Batson claim was satisfied in this case because Johnson, as an African-American, is a member of a cognizable racial group. In order to establish a prima facie case of purposeful discrimination, Johnson was also required to show that the State used its peremptory challenges against members of his race. In this case, the prosecution used four of its six peremptory challenges to strike African-American venire members from the jury panel. The State's remaining two peremptory challenges were used to strike two Caucasians. Finally, Johnson was required to establish that an inference existed that the prosecutor struck the four black members of the venire because of their race. The trial court ruled in this case "that there is no evidence of [a] pattern of racial discrimination; and, therefore, the [Batson] motion will be overruled."
¶ 19. Johnson argues on appeal that he was only required to establish that the State had used some of its peremptory challenges on members of Johnson's race and that the circumstances of the case gave rise to an inference that the State used its challenges against persons because of their race. We rule that Johnson failed to demonstrate on appeal that the trial court's ruling on this issue was clearly erroneous. At trial, the following exchange took place between the trial court and Johnson's attorney:
BY MR. LANCASTER: The Defendant noticed that the State has been striking minority jurors and ask under the Batson versus Kentucky for reasons.

*656 BY THE COURT: Motion is taken under, will be delayed at this time.
...
BY THE COURT: ... [A Batson] motion has been made. Is there anything further?
BY MR. LANCASTER: Yes, Sir. That's it.
...
BY THE COURT: The motion is overruled if there is no further proof to be offered in that regard.
BY MR. LANCASTER: We understand the case law is that when we made the motion, the burden shifts. We don't have to necessarily identify race.
BY THE COURT: I understand you've got to show a pattern. I may be wrong. I don't want to get down yonder and have to come back.
¶ 20. At this point, the trial court went through the entire list on the venire identifying the race of each of its fifty-one members.
BY MR. LANCASTER: After having reviewed the entire venire, is the Court saying lack of pattern of race discrimination? Is that the ruling?
BY THE COURT: Yes, sir. That's what the Court finds; that there is no evidence of pattern of racial discrimination; and therefore, the motion will be overruled.
¶ 21. The number of peremptory strikes which the State used against the minority members, standing alone, is insufficient to establish an inference to a pattern of purposeful discrimination. Dennis v. State, 555 So.2d 679, 681 (Miss.1989) (ruling that the appellant had not established that an inference of purposeful discrimination by the prosecution solely on the number of peremptory challenges the State used against black members of the jury pool). The trial court is required to look to the overall circumstances of voir dire as well as the prosecutor's remarks and questioning during voir dire in order to decide whether a prima facie case of purposeful discrimination has been established. Griffin v. State, 607 So.2d 1197, 1201 (Miss.1992). In Batson, the United States Supreme Court stated:
In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.
Batson, 476 U.S. at 97-98, 106 S.Ct. 1712.
¶ 22. We rule that the trial court was not clearly erroneous in finding that no pattern of racial discrimination was employed by the State in the jury selection process. Thus, this assignment of error is without merit.

III. DID THE TRIAL COURT ERR WHEN IT DENIED THE APPELLANT'S MOTION FOR NEW TRIAL ON THE GROUND THAT IT WAS REVERSIBLE ERROR FOR THE TRIAL COURT TO ALLOW AN INVOLUNTARY CONFESSION INTO EVIDENCE?
¶ 23. When we review the question of whether a statement given by the accused and used against him was made voluntarily, "our scope of review is confined to... established limits." Morgan v. State, 681 So.2d 82, 87 (Miss.1996). "The general rule is that for a confession to be admissible it must have been given voluntarily and not given as a result of promises, threats or inducements," Id. at 86. Additionally, the State has the burden of proving beyond a reasonable doubt that a confession by the accused and offered at trial was voluntarily given. Haymer v. State, 613 So.2d 837, 839 (Miss.1993). The State meets its burden when testimony of a police officer or other person having knowledge of the confession is offered and when the officer testifies that the confession or statement sought to be introduced into evidence was in fact given without *657 "threats, coercion, or offer of reward." Cox v. State, 586 So.2d 761, 763 (Miss.1991). The determination of voluntariness by the trial court is a fact finding function. Alexander v. State, 610 So.2d 320, 326 (Miss.1992). "So long as the [trial] court applies the correct legal standards, `we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous.' Where, on conflicting evidence, the court makes such findings this Court generally must affirm." Id. (citations omitted). Further, "[t]he applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." Herring v. State, 691 So.2d 948, 956 (Miss.1997) (emphasis added) (quoting Porter v. State, 616 So.2d 899, 907-08 (Miss.1993)). However, "our scope of review is less constrained where detailed and specific findings by the trial court are lacking on critical issues." Abram v. State, 606 So.2d 1015, 1031 (Miss.1992) (emphasis added). See also McCarty v. State, 554 So.2d 909, 912 (Miss.1989).
¶ 24. In a pre-trial hearing, Johnson moved to have a statement which he gave to law enforcement officials suppressed on the ground that the statement (1) was involuntarily given and (2) that he was not properly given his Miranda rights in violation of his constitutional rights. Johnson was arrested on January 1, 1996, and held at the Houston, Mississippi, Police Department detention facilities. After being detained in the Houston jail for a couple of days, Johnson gave the following written statement to police officers:
Statement by Sonny Johnson, 1-3-96 7:45 p.m.
We came back to the pool hall. I went behind the building to use the bathroom. I found a gun. I didn't tell no body I found it. I went in the pool hall. We shot some pool. Then, J.P. came in an then he said ain't you that boy from Mantee. I said yes. he said they don't allow Mantee up here. I told him I was not going no were [sic]-he touch some fellow-he wen't [sic] out sid [sic] and came back in and told J.P. it wasn't there. He pick up a stool, and put it down, and said F___ that and reach in his pocket and I grab him and pull out the gun. It wasn't aim at knowbody [sic] he grab the gun and if went off. I panick [sic]. The gun drop. He ran out the door. I run behind him going to the car tell Lavarus to come on somebody was shooting. We jump in the car and went home.
/S/ Sonny Johnson
¶ 25. At the suppression hearing, two police officers from the Houston Police Department testified. First to testify was Officer Tom Robertson who stated that Johnson wanted to talk to him about getting out of jail on bond. According to Robertson, he explained to Johnson the procedure for obtaining release from jail by posting the different forms of bond. Thereafter, Robertson testified that he orally informed Johnson of his Miranda rights and provided Johnson a "Waiver of Right" form to sign that also included a statement of Johnson's Miranda rights. Johnson signed the document and then gave Robertson a hand-written statement describing the events surrounding the shooting that involved Joseph Pratt as shown above. Robertson also testified as follows:
A. He was asking me to see if I could get his grandmother, his uncle, or somebody related to him to come up there and go on this paper bond for him; and I explained to him that if he would stopI didn't say it in those words; but if he would stop telling stories and tell the truth, I would see what I could do about getting up with some of his relatives to get him out of jail.

Q. Other than that did you make any promises, or did anybody else in your presence make him any promises, or are you aware of anybody making him any promises other than that to get him to sign that waiver or make that statement?
A. No, I'm not.
Q. Did you threaten him or intimidate him in any manner or did anybody else in your presence or anybody else to your knowledge intimidate or threaten him in order to get him to give you that statement?
A. No, I didn't.
(emphasis added). On cross-examination, the following exchange occurred:

*658 Q: But you told him to quit telling stories; isn't that correct?
A. Yes, but ... [I] wasn't speaking of statements that he had made to me. When I got in that afternoon, the officer advised me that he wouldn't tell the truth, wouldn't tell where the weapon was, and things of that nature.
...
Q. He was just giving this statement to get out on bond.
A. I can't say that was the onlyest reason he gave the statement. I'm sure it was part of it.

...
He was talking to me about ways for him to get out. After that I believeI'm not for sureI let him make one or two telephone calls; and he came in the office; and he talked to me; and that's when I took the statement.
(emphasis added). Robertson also testified that when Johnson decided to give a written statement, the Appellant stated, "I want to make a clean breast of it," indicating his willingness to cooperate with the authorities. According to Robertson, Johnson had been locked up in the small Houston jail for two days in January in an area that was cold and unheated.
¶ 26. Police Officer James Blue was also present when Johnson gave his written statement. Officer Blue testified at the suppression hearing that Johnson had previously been asked to give a statement but had refused to do so. According to Blue, Johnson appeared to be lonely in the Houston jail and was scheduled to be transferred to the county jail. Blue stated:
To the best of my recollection it was Officer Robinson and myself were on duty together, and Mr. Johnson was in jail on a charge. He had previously been asked to give a statement and wouldn't, so our only alternative was to put him back there and hold him. If I remember correctly, the county was wanting him anyway; and he sat back there for a couple of days.
The way I remember it, he [Johnson] got tired of sitting back there and asked if he gave a statement, would we go on and transfer him to county.

...
We had him in jail on a charge. He was not leaving jail regardless. He could not make bond. He had already called everybody in creation to see if somebody would come bond him out; and nobody ever came; and he was tired of sitting in jail, in our jail, because it's small.
Q. Why would he be transferred if he gave a statement? I don't understand.
A. In years past or in the last two administrations that has been common policy. The sheriff will permit them to be transferred, our felony prisoners to be transferred to the county.
Q. But what does the statement have to do with it is my question, with him being transferred.
A. None whatsoever. He would have been transferred regardless.
Q. And were there any promises made to him by you or Mr. Robinson or by anybody in order to get him to give that statement.
A. None whatsoever. We had nothing to gain from it.
Officer Blue explained in his testimony that a criminal defendant was only transferred from the city police department to the county authorities after a preliminary hearing was held or where the accused waived his right to the hearing.
¶ 27. After concluding with Officer Blue's testimony, counsel for Johnson argued that the State had failed to meet its burden in establishing that Johnson's statement had been given voluntarily and that Johnson's statement was given in exchange for the promise of a bond or to be transferred from the police station to the county jail. Without comment, the trial court overruled Johnson's motion to suppress the statement. The trial judge stated simply: "Motion is overruled under the present testimony as given." Because the trial court failed to make any specific findings regarding the voluntariness of Johnson's statement, we are less restricted in our review. Abram, 606 So.2d at 1031.
¶ 28. It is well-settled in this state, that a confession obtained as a result of promises, *659 threats, or other inducements are inadmissible at trial. Chase v. State, 645 So.2d 829, 837-38 (Miss.1994). In addition, the Mississippi Supreme Court has, in several cases, addressed the matter of inducing a statement with the offer of bond or a decreased bond. In Blalock v. State, 79 Miss. 517, 522, 31 So. 105, 106 (1902), the Mississippi Supreme Court ruled that a confession obtained in response to the arresting officer informing the accused that he was his friend and "would go on his bond, if necessary," was inadmissible. See also Harrison v. State, 285 So.2d 889, 891 (Miss.1973).
¶ 29. In Barnes v. State, 199 Miss. 86, 23 So.2d 405 (Miss.1945), our supreme court reversed and remanded the appellant's conviction on the ground that his confession was not voluntary and freely given. In Barnes, the appellant was promised that his daughter and son would be released from jail if he confessed. Furthermore, the sheriff who obtained the appellant's confession informed the accused that the law would be "lighter" on him if he would confess and that he (the sheriff) would sign his bond, providing the court would permit as such. Id. at 407. In Clash v. State, 146 Miss. 811, 112 So. 370 (1927), the defendant confessed to a store owner that he had stolen $900. Immediately after the oral confession, the defendant was taken to the local sheriff's office where his confession was reduced to writing and the defendant signed the confession. The store owner testified that he did not make any promises to the defendant prior to making his confession other than informing him that "if he would tell us about the money, and return it, we would let him out of jail on bond." The supreme court held the admission of the confession at trial was prejudicial error. Id. at 370.
¶ 30. As stated, the State has the burden of proving beyond a reasonable doubt that the statement obtained from Johnson was voluntary and not in response to promises made to him. Morgan, 681 So.2d at 86. The Mississippi Supreme Court has forbidden any coercion or promises of leniency to a defendant. In fact, the Abrams court stated that law enforcement officers are not to give suspects the impression that "cooperation by the suspect might be of some benefit." Abram, 606 So.2d at 1031. "A confession made after the accused has been offered some hope of reward if he will confess or tell the truth cannot be said to be voluntary." Abram, 606 So.2d. at 1032. Even further, the Mississippi Supreme Court stated "[w]e have repeatedly condemned the practice whereby law enforcement interrogators, or related third parties, convey to suspects the impression, however slight, that cooperation by the suspect might be of some benefit." Id. at 1031 (citations omitted) (emphasis added).
¶ 31. In the case sub judice, the trial court made no specific findings of fact concerning the "totality of the circumstances" that led it to conclude that the statement of Johnson was admissible. Following McCarty v. State, 554 So.2d 909, 912 (Miss.1989), in the absence of any specific or detailed findings of fact by the trial court as to how it determined that the statement by Johnson was voluntary, we are not bound by the "clearly erroneous" standard in reviewing the trial court's ruling on this issue, and we are entitled to determine for ourselves whether the statement by Johnson was voluntary beyond a reasonable doubt.
¶ 32. It is impossible to say from the record before us that Johnson's statement was voluntary beyond a reasonable doubt. The testimony from the two officers reveal that when Johnson gave his written statement, he was eager to get out of jail on bond and was not able, on his own, to get the assistance of his family in securing his bond. The officers on duty, in our opinion, gave Johnson the impression that if he gave the officers a written statement, they would (1) assist him in locating and/or contacting his relatives in order to obtain a bond for his release or (2) have him transferred to the county jail. Although both officers testified that they did not make any promises to Johnson in exchange for his confession or statement, it is clear that the statements to which they did admit left the Appellant with the impression that he would be either released on bond or moved from the cold and small detention area in which he had been held for at least two days. Based upon the record before us, *660 we rule that the trial court erred in overruling the motion of the Appellant to suppress his statement. We find that Johnson's statement was improperly induced. Thus, this action is reversed and remanded for a new trial consistent with this opinion.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF CHICKASAW COUNTY IS REVERSED AND REMANDED FOR A NEW TRIAL CONSISTENT WITH THE TERMS OF THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO CHICKASAW COUNTY.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and COLEMAN, DIAZ, HINKEBEIN, KING, PAYNE and SOUTHWICK, JJ., concur.